IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC. | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| GRANT STINCHFIELD | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Ackerman McQueen, Inc. ("*AMc*"), files its Original Complaint against

Defendant, Grant Stinchfield ("*Defendant*"), as follows:

### PRELIMINARY STATEMENT

1.      This is an action to recover money damages based on false and disparaging

statements regarding AMc made by Defendant in order to hurt AMc's standing, and

improve the National Rifle Association of America, Inc.'s (the "NRA") standing, in the

eyes of the American public.   The instant case is driven by the NRA, its increasing

vulnerable public face, Wayne LaPierre, and their sinister and intentional efforts to

destroy AMc's business.   When the NRA decided to sever ties with AMc earlier in 2019,

the NRA pulled the plug on its online video channel, NRATV, where Defendant served

as a host of a current events program called "Stinchfield."   At the time, Defendant

lamented the demise of NRATV, stating publicly that he was disheartened to see the end

of NRA's live programming and that he had "never been so proud to work for an

organization than I have at NRA TV."

2.      Now, however, Defendant has now decided to align himself with the NRA and LaPierre, whose smear campaign against AMc is designed to deflect attention from the civil investigation by the New York State Attorney General into the NRA's and LaPierre's spending habits, which place LaPierre's livelihood and the NRA's nonprofit tax-exempt status in jeopardy.  Defendant now finds himself right in the trough with the NRA and LaPierre, having publicly disseminated maliciously false statements regarding AMc and its business in support of the ongoing smear campaign.  Defendant's wrongful conduct, which includes publication to the media of demonstrably false accusations about AMc, constitutes libel *per se* and business disparagement and has caused financial and reputational injury to AMc.  AMc accordingly seeks compensation for all damages incurred.

## NOTICE OF RELATED CASE

3.      In accordance with Local Rule 3.3, AMc hereby provides notice that there is a related case, as defined by LR 3.3(b)(1), (b)(2), or (b)(3).  The related case is Case No. 3:19-cv-02074-G, styled *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, and is pending before the Hon. A. Joe Fish.

## PARTIES

4.      AMc is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City,

Oklahoma.  It is an advertising and public relations agency that, until recently, counted the NRA as one of its clients.

5.      Defendant is an individual who resides in the City of Dallas, Dallas County, Texas.  Until recently, he was employed by AMc, where he was a host on the NRA's streaming channel, NRATV.  He may be served with process at his residence located at 6217 Goliad Ave., Dallas, Texas 75214.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendant because he is domiciled in this District, which is also where the events giving rise to this complaint took place.

8.      Venue is proper in this Court pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to AMc's claims occurred in this District.

## FACTUAL BACKGROUND

**A.      The relationship between AMc and the NRA.**

9.      The NRA and AMc worked together since the 1980s.  Over that time, the NRA engaged AMc to perform public relations and strategic marketing services,

including media planning and placement and management of digital media platforms and websites.  For almost four decades, AMc served the NRA expertly, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  AMc helped create some of the NRA's most memorable messaging, including former NRA president Charlton Heston's famous rallying cry: "I'll give you my gun when you pry it from my cold, dead hands."

10.     The relationship between AMc and the NRA was managed at the direction of LaPierre, with input from his AMc counterpart, Angus McQueen, the long-time CEO of AMc.  LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward," he seemed ill suited to head what many describe as a strident advocacy group.  Nevertheless, he was the NRA's choice to lead the organization, where he has served as Executive Vice President and Chief Executive since 1991.

**B.     The creation and evolution of what became NRATV.**

11.     Beginning in the early 2000s, AMc assisted the NRA in the development of its own branded media platform, in addition to placing advertisements in traditional media.  It began with the NRA's webcast, NRA Live, in 2000.  In 2004, the NRA began offering NRA News, which provided video content available via smartphone applications, web browsers, and streaming devices that was billed as "the most comprehensive video coverage of Second Amendment issues, events, and culture

anywhere in the world."  The platform expanded to include various targeted networks such as NRA Women, a network designed for female gun enthusiasts, and NRA Freestyle, a network that featured TV shows and a daily blog aimed at reaching the new generation of gun owners in America.

12.     Throughout 2015, AMc worked to create both a "Super Channel" that could be streamed online and a program called "Freedom's Safest Place," a newly created campaign developed by AMc to offset the loss of earlier profitable programs that would be available on the "Super Channel" as well as on national television.

13.     In 2016, AMc and the NRA launched NRATV, an expanded version of the platform that brought most of these ventures under the same umbrella and was frequently perceived by the public as the "voice" of the NRA.  NRATV, suddenly now the scourge of the NRA, LaPierre, and Defendant, was created and expanded at the sole direction of LaPierre.  It was supposed to be the future of the NRA's modern media presence—a dynamic, slickly produced digital platform that would reach millions of viewers and develop more dues-paying members for the NRA.

14.     Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment guaranteed by the NRA).  Within a short period, AMc – at LaPierre's request and with his approval – hired or contracted with several locally, regionally, and/or nationally recognized talents,

including Defendant, whose job it was to deliver hard-hitting commentary on Second Amendment and American freedom issues.

**C.    The NRA touted NRATV as one of its most successful projects.**

15.    For several years, the NRA touted NRATV to its members and directors as one of its proudest and most successful projects.  Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics, repeatedly told AMc personnel how well the network was performing and that the NRA would continue to support NRATV, financially and otherwise.  Not only did LaPierre sign off on every performance metric of NRATV, he also made numerous presentations to his Board in support of NRATV that were, from all appearances, favorably received.  Indeed, one board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."  NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups and others.

**D.    Defendant was proud of AMc and NRATV, too.**

16.    Defendant was a proponent of AMc and NRATV, too.  He disparages and defames AMc now, yet he previously said that "working for [AMc] is truly an honor" and that he was "proud to be part of an amazing organization."

17.    Defendant was the host of a current events program on NRATV for which he seemed to be very proud.  He routinely retweeted clips from the program on his

personal Twitter account and posted them on his Facebook page.  He liked to brag about the viewership of NRATV, too.  As one example, after NRATV posted a clip of Defendant interviewing Sig Sauer's Tom Taylor, Defendant sent Mr. Taylor an email stating, "Did you see this clip of one of our segments?  Its got 240K views!"

18.     He also praised the mission of NRATV, noting that *The New York Times*, *The Washington Post*, MSNBC, and CNN "know that to get to the Second [Amendment], they have to go straight through the NRA, and who do you think is on the front lines of that information war?  NRATV."  He defended NRATV's messaging as well.  When the NRA decided to pull the plug on NRATV citing concerns about NRATV's programming becoming too far removed from the NRA's core mission of defending the Second Amendment, Defendant issued his own statement: "If you think I'm too blunt, our words are too strong, quit your whining, get serious about this fight or move over and let someone else fight for you."  "Make no mistake," he continued, "all the issues we face today, from immigration to spending to the battle over our guns to the war on terror and free speech, they are all connected.  If you only fight for the Second [Amendment], you ignore the others."

**E.     Defendant becomes a pawn in the NRA's and LaPierre's game.**

19.     It is curious then that Defendant has now decided to align himself with the NRA and LaPierre and their smear campaign against NRATV.  His allegiance to the NRA seemingly increased in the summer of 2019, after the NRA cancelled NRATV, doing away

Defendant's lucrative salary in the process.  In July 2019, Defendant requested to be released from his employment with AMc, as it was posing a problem for a potential new employer – an employer he has since admitted was the NRA.  On October 4, 2019, he resigned from his employment with AMc, purportedly with an effective date of August 31, 2019, to become a pawn in the NRA's and LaPierre's game.

20.     To that end, AMc recently received a copy of an "affidavit" signed by Defendant on December 10, 2019, in which he makes numerous false statements about AMc.  Curiously, the so-called affidavit was not filed with a court of law or other tribunal.  Instead, it was sent directly to the media, and appears to have been created for the sole purpose of disseminating it to the media in order to further defame AMc.

21.     Defendant states in the so-called affidavit that "PowerPoint presentations, digital dashboards, and other 'metrics' that I understand were presented by Ackerman executives to describe the performance and viewership of NRATV . . . were distorted and did not tell the whole story of how few actual live viewers we had."  Of course, this is the same person who bragged to Sig Sauer's Tom Taylor about the 240,000 views of their interview together using the very same analytics he now decries.

22.     In truth, the analytics are not only legitimate, they are impressive across all of the same platforms that media companies everywhere use to judge success in engagement and reach.  Periodic reports containing detailed analytics were regularly provided to LaPierre from 2016 through May 13, 2019.  LaPierre himself personally

approved the development of a customized dashboard that accumulated data from all the platforms running NRATV content. NRA and LaPierre had the opportunity to audit the analytics in any way that they wished. The NRA even sent Todd Grable, the NRA's head of membership, to review AMc's analytics and methodology in October 2018, after which the NRA approved the AMc budget for 2019.

23. The notion that AMc's metrics presented a distorted view of live viewership is completely false. The analytics presented to the NRA accurately tracked metrics such as engaged views, completed views, total views, and age and gender demographics. And, while Defendant claims the analytics presented a distorted picture of live viewership, the NRA never even requested a metric regarding "live viewership." The NRA understood that the value of NRATV was based on engagement and reach.[1]

24. Defendant's written statement also claims that AMc "aggressively sought to limit interaction between NRATV talent and NRA leadership" and that the late Angus McQueen instructed Defendant that AMc, not the NRA, would set the agenda for NRATV's programming, determine the messaging, and decide how NRATV would

---

[1] Notably, some of the presentations contained media valuations for on-air talent, including Dana Loesch and Dan Bongino, both of whom regularly appeared as guests on Fox News, CNN, other media outlets. Defendant was never included as part of the valuations of on-air talent because LaPierre viewed Defendant as a loose cannon who could not be trusted to do unscripted media appearances. LaPierre's concerns appeared to be well founded. Just as an example, Defendant and NRATV came under severe scrutiny in 2017 after Defendant made a so-called "joke" encouraging North Korea to launch a nuclear attack on Sacramento, California.

broadcast it.  Defendant even claims that Mr. McQueen went so far as to tell him, "the NRA is not your boss – I am."

25.     The documented proof, however, shows that Defendant was grateful for and respected the late Mr. McQueen's leadership and the manner in which NRATV's programming was developed.  In fact, Defendant himself admitted that "Angus has always said he would never make me read anything I'm not comfortable with." Furthermore, Defendant was allowed to generate his own content and pitch ideas to the NRA, often times with direct input from and interaction with the NRA's leadership.  He was given autonomy to conduct his own research, rewrite scripts that others prepared for him, set up meetings with potential sponsors, and the like.  Reality is a far cry from the portrait Defendant attempts to paint in his written statement regarding the work environment at NRATV.

26.     Defendant also states in his written statement that he began to question the cost-effectiveness of live programming in late 2017 and into 2018, but Mr. McQueen "harshly dismissed" the idea of using targeted videos on YouTube, Facebook, and Twitter in favor of expanding the footprint of NRATV.  He claims Mr. McQueen did so because AMc "was intent upon transforming itself from an ad agency into a live television newsroom, and using the NRA to finance this goal."

27.     The documented proof shows that Defendant had little concern about the cost-effectiveness of NRATV's live programming, however, and instead was mainly

concerned with increasing NRATV's costs by way of increasing his own salary. The main cost of live programming is the talent, i.e., the salaries and other compensation paid to the on-air personalities, including Defendant. At NRATV, those costs were well into seven figures. Defendant feigns concern about NRATV becoming more cost-effective, yet Defendant asked for an increase in pay in late 2017, with a one-year guaranteed salary. Then, in late 2018, he asked for yet another raise, this time requesting a three-year guaranteed deal with 15% automatic raises built in each year. Thus, he did not express concerns about NRATV's costs. He was seeking to increase NRATV's live programming costs by demanding more and more money.

28.     The charges for live streaming that Defendant claims he was concerned about are miniscule in comparison to the amounts paid to on-air talent. Additionally, the pre-produced programming that Defendant claims he fought for actually costs more to produce because you not only have the costs of the talent, but the post-production editing expenses as well. Defendant's hollow cries regarding the expenses of live streaming simply do not ring true.

29.     In addition, costs are not the only consideration. Live programming was the quickest way to get messaging out after a tragedy. The analytics presented to NRA showed that NRATV, including Defendant's program, became a go-to source for information after the Parkland school shooting, when an armed school resource officer

stopped a school shooting in Maryland, and after other similar events of national importance.

30.    Furthermore, AMc did not seek to expand NRATV's live programming with the intent of transforming AMc into a newsroom, much less with the intent of financing its metamorphosis using the NRA's money.   As indicated above, AMc expanded the footprint of NRATV at the NRA's and LaPierre's express direction and approval, including approval of NRATV's budget.

31.    Lastly, Defendant's written statement contains false and disparaging statements regarding AMc's position with respect to two programs created by the NRA, Carry Guard and School Shield.  Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  School Shield is the NRA's program for providing best practices in security infrastructure, technology, personnel, training, and policy to schools.  Defendant contends in his written statement that AMc is now disparaging the two programs, whereas AMc used to be an enthusiastic proponent of the programs.

32.    The impetus for Defendant's statement in this regard is a pleading filed by AMc in a separate lawsuit involving the NRA, LaPierre, AMc, and others.  AMc noted in its pleading that it began to have concerns about the NRA's direction under LaPierre's leadership beginning in 2018, after the NRA engaged AMc to develop the training component of the Carry Guard program and provide public relations and branding

support.   Again, the program was designed to have two components: (a) a training component, which was AMc's responsibility to develop, and (b) a liability insurance component, which was entirely the NRA's responsibility.   The NRA's Josh Powell was trying to get AMc to promote the insurance portion of the program, but was simultaneously referring to Carry Guard as nothing but an "insurance scheme."   AMc wanted nothing to do with a "scheme."   AMc was and always had been an enthusiastic proponent of Carry Guard's training programs, however.   Indeed, Defendant himself ran a segment on NRATV called "Carry Guard Daily" that focused on the training aspect of the Carry Guard program, which LaPierre and other executives systematically disassembled.

33.     Defendant also misconstrues AMc's position with respect to School Shield. School Shield is the program the NRA developed in the wake of the Sandy Hook tragedy in 2012 to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, plans to make schools more secure, and help to locate qualified armed safety officials.   AMc has not disparaged School Shield.   AMc has expressed frustration with respect to way the NRA treated School Shield.

34.     The NRA and LaPierre, for a time, showed no intention to execute the program's mission.   Although the NRA raised millions of dollars through the program, School Shield had issued a paltry five grants as of the end of 2014.   The NRA was ignoring School Shield's mission, causing AMc to express reservations about promoting

something that the NRA was failing to deliver as promised.  When Oliver North became President of the NRA in 2018, however, he demanded that the NRA "make it real."  At that point, AMc became a willing participant in promoting the School Shield program. The assertion that AMc is disparaging Carry Guard and School Shield is, therefore, false.

**E.      The motivation for Defendant's maliciously false written statement.**

35.      Importantly, although styled as an affidavit, Defendant's maliciously false written statement has not been filed in connection with any type of lawsuit.  Rather, Defendant, in conjunction with the public relations arm of the NRA's law firm, Brewer Attorneys & Counselors, published the affidavit directly to the press as part of the smear campaign against AMc.  In fact, the recipients of the written statement used it to generate negative press about AMc just days after Defendant signed it.

36.      For example, *The Daily Beast* ran an article on December 18, 2019, under the headline: "NRATV Wanted to Become a 24/7 Newsroom Using NRA Funds: Ex-Host."[2] The article quotes directly from Defendant's written statement, including the portions in which Defendant falsely stated that AMc sought to turn itself into a live television newsroom using NRA funds, sought to limit NRATV's interaction with the NRA and controlled the agenda for programming, and prepared metrics for NRA leadership that were "distorted" and failed to "tell the whole story of how few live viewers" NRATV

---

[2]    Available    at    https://www.thedailybeast.com/nratv-wanted-to-become-a-real-newsroom-using-nra-funds-says-ex-host-grant-stinchfield (last accessed Dec. 19, 2019).

actually had.  *Newsweek* ran a similar story the same day that quoted directly from Defendant's written statement.[3]

37.     Defendant's past actions regarding NRATV, detailed above, baldly contradict his current stance regarding AMc and NRATV.  The contrived notion that NRATV was a failed endeavor for which AMc should be held accountable has only lately emerged as part of the NRA's and LaPierre's assault on AMc – an assault that is designed to deflect attention from LaPierre's gross financial mismanagement of the NRA and the New York State Attorney General's civil investigation and potential criminal charges against the NRA and LaPierre.

38.     Defendant's written statement, which was disseminated directly to the press, is simply the latest of LaPierre's and Brewer's inflammatory public relations maneuvers.  Over the course of several months beginning with the NRA's retention of Brewer in 2018, the NRA has taken an increasingly aggressive stance against its long-time vendor, AMc.  LaPierre set about to intentionally destroy the relationship between the parties, not only through the conduct of vexatious litigious activity, but through the ouster of AMc in favor of the Brewer firm's public relations/crisis management arm.

39.     The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant who is determined to litigate its case it the media rather

---

[3] Available at https://www.newsweek.com/nratv-ackerman-mcqueen-nra-guns-1477939 (last accessed Dec. 19, 2019).

than in the courtroom.  The NRA has filed numerous different lawsuits against AMc and others in recent months, and each has been accompanied by carefully orchestrated leaks and false, self-serving press releases.  Defendant's written statement is but another transparent attempt to deflect attention from the NRA's own factual and legal shortcomings and to wreak havoc within an advertising organization with which the Brewer public relations machine now competes.

## CAUSES OF ACTION

### Count One – Defamation

40.     AMc incorporates the paragraphs above as though copied verbatim herein.

41.     As set forth hereinabove, Defendant intentionally and maliciously defamed AMc, a private figure, by falsely accusing AMc of (a) presenting "distorted" analytics to the NRA in order to (b) improperly use (i.e., steal) the NRA's funds to transform itself into a "live television newsroom" and otherwise use the NRA's funds in an inefficient, wasteful manner and (c) wrest control of the NRATV platform and its messaging to the detriment of the NRA.

42.     Defendant published these accusations as statements of fact, and did so publicly to third parties, including members of the press.  Alternatively, Defendant published the statements to the Brewer PR machine under circumstances where a reasonable person would recognize that his actions created an unreasonable risk that the defamatory statements would be communicated to other parties.

43.     Defendant is a non-media defendant, as he was not acting as a member of the print, broadcast, or electronic media at the time.

44.     In the maliciously false written statement, Defendant identified AMc directly by name, and the accusations of commission of a criminal act are defamatory per se.  Defendant's false accusations have exposed AMc to public scrutiny and ridicule, have wrongfully impeached AMc's honesty, integrity, and reputation, and caused AMc to suffer financial injury.  Furthermore, they have injured AMc in its professional capacity as an advertising and public relations agency.

45.     The subject matter of Defendant's false factual statements is a decidedly private matter, despite the NRA's, LaPierre's, and Brewer's attempts to make it a matter of public concern.

46.     Defendant published his false statements maliciously, with knowledge of or with reckless disregard for their falsity.  Alternatively, Defendant published them negligently.

47.     AMc has suffered injury as a direct result of Defendant's false statements in a yet undetermined amount, for which AMc seeks recovery.

### Count Two – Business Disparagement

48.     AMc incorporates the paragraphs above as though copied verbatim herein.

49.     As set forth above, Defendant published false and disparaging statements about AMc's economic interests.

50.     He published them directly to third parties, including members of the press, or he published them to the Brewer PR machine under circumstances where a reasonable person would recognize that his actions created an unreasonable risk that the disparaging statements would be communicated to other parties.

51.     The statements were disparaging because they cast doubt about the quality of AMc's services and the character of its business, and Defendant knew that his statements would cast doubt and create a false and defamatory impression.

52.     The statements are demonstrably false, as detailed above.

53.     Defendant knew the statements were false, acted with reckless disregard for whether the statements were true, acted with ill will, and/or intended to interfere with AMc's economic interests.

54.     Defendant communicated the statements without privilege.

55.     The publication of the disparaging statements has caused actual and special damages, including but not limited to expenses of counteracting the publication.

56.     AMc has suffered injury as a direct result of Defendant's false statements in a yet undetermined amount, for which AMc seeks recovery.

## DEMAND FOR JURY TRIAL

57.     AMc hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

**PRAYER**

58.     For all the foregoing reasons, AMc requests that this court enter judgment

in its favor and award it the following relief against Defendant:

a.     actual damages in any amount to be proven at trial;

b.     special damages, including loss of past and future income;

c.     exemplary damages;

b.     costs of court;

c.     pre-judgment and post-judgment interest at the highest lawful rate; and

d.     such other relief; at law or in equity, to which AMc may be justly entitled.

Dated: December 20, 2019.

Respectfully submitted,

*/s/ Brian Vanderwoude*

**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFF
ACKERMAN MCQUEEN, INC.**

JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ackerman McQueen, Inc.

**DEFENDANTS**
Grant Stinchfield

**(b)** County of Residence of First Listed Plaintiff   Oklahoma County, OK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dorsey & Whitney, LLP, 300 Crescent Court, Suite 400, Dallas, TX 75201, (214) 981-9900

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☒ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Fish
DOCKET NUMBER   3:19-cv-02074-G

DATE
12/20/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Brian Vanderwoude

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE