# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **ACKERMAN MCQUEEN, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GRANT STINCHFIELD,** | § | **CIVIL ACTION NO. 3:19-CV-03016-X** |
| | § | |
| **Defendant.** | § | |

## APPENDIX IN SUPPORT OF DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR ENTRY OF PROTECTIVE ORDER

Defendant Grant Stinchfield ("Stinchfield") offers the following evidence in support of

his response in opposition to Plaintiff's motion for entry of protective order:

| EXHIBIT | DESCRIPTION | PAGE NO. |
|---|---|---|
| **A.** | Plaintiff's Response to Defendant's Request for Production | **APP. 001-021** |
| **B.** | Email re AMc objections to Stinchfield RFP-first meet and confer notes | **APP. 022-023** |
| **C.** | AMC's Proposed Protective Order | **APP. 024-047** |
| **D.** | Emails follow-up re meet and confer | **APP. 048-050** |
| **E.** | Judge Toliver's order in N.D. Texas: NRA v AMc | **APP. 051-056** |
| **F.** | Competitor Identification and Competitor Analysis: A broad-based Managerial Approach | **APP.057-070** |
| **G.** | Brewer's Website re Public Relations | **APP. 071-072** |
| **H.** | Andrew Arulanadam & Craig Spray Declarations | **APP. 073-083** |

**I.**     Travis Carter's Declaration                     **APP. 084-098**

July 16, 2020            Respectfully submitted,

                        **BREWER, STOREFRONT, PLLC**

        By:      */s/ Ian Shaw*
                        Ian Shaw, Esq.
                        State Bar No. 24117041
                        ins@brewerattorneys.com
                        1717 Main Street, Suite 5900
                        Dallas, Texas 75201
                        Telephone: (214) 653-4000
                        Facsimile: (214) 653-1015

                        **ATTORNEYS FOR DEFENDANT**
                        **GRANT STINCHFIELD**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was electronically served via the Court's electronic case filing system upon all counsel of record on this 16th day of July 2020.

                        */s/ Ian Shaw*
                        Ian Shaw

2

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC. | § | |
| | § | |
| v. | § | Case No. 3:19-cv-03016-X |
| | § | |
| GRANT STINCHFIELD | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## RESPONSE FOR PRODUCTION

TO:   Grant Stinchfield, by and through his attorneys of record, William A. Brewer III and Ian Shaw, Brewer, Attorneys & Counselors, 1717 Main Street, Suite 5900, Dallas, Texas 75201.

Plaintiff, Ackerman McQueen, Inc. ("*AMc*"), serves its Response to Defendant's

Request for Production.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      AMc objects to Defendant's request for the production of metadata because it is out of proportion to the needs of this case.

2.      AMc object to the instructions in paragraph 7 with respect to the manner in which documents should be produced because it exceeds the scope and requirements of the Federal Rules of Civil Procedure.

3.      AMc objects to the definition of the term "document" to the extent it exceeds the scope and requirements of the Federal Rules of Civil Procedure.   In responding to the discovery requests below, AMc will construe those terms to mean "documents and electronically stored information" as defined in Federal Rule of Civil Procedure 34(a)(1)(A).

4.      AMc objects to the definitions of the terms "NRA" and "Defendant" to the extent they purport to require AMc to ascertain who is or is not acting on their behalf or pursuant to their directions.   In responding to the requests below, AMc will construe

those terms to mean The National Rifle Association of America and Grant Stinchfield, respectively.

5.     AMc objects to the definition of the terms "You", "Your," and "Plaintiff" because it necessarily causes the requests to call for the disclosure of information that is protected by the attorney-client privilege and work product doctrine.  In responding to the discovery requests below, AMc will construe those terms to mean Ackerman McQueen Inc.

6.     AMc objects to the instruction regarding lost or destroyed documents because it exceeds the scope and requirements of the Federal Rules of Civil Procedure.

## SPECIFIC OBJECTIONS AND RESPONSES

REQUEST FOR PRODUCTION NO. 1:  Documents regarding client complaints.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 2:  Documents regarding client complaints from former clients.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 3:  Documents regarding employee complaints between or among You and your employees.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 4:  Documents regarding employee complaints between or among You and your former employees.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 5:  Documents regarding vendor complaints between or among You and Your current vendors.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 6:  Documents regarding vendor complaints between or among You and Your former vendors.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 7:  Any documents that refer or relate to the creation, development, and launch of NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 8:  Documents between Mr. McQueen and AMc's board that refer to NRA TV's viewership analytics.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 9:  Documents referring or relating to NRATV viewership, including but not limited to, documents concerning viewership numbers, analytics, or data claiming to represent, correspond, or otherwise relate to "unique,"

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 3**

"genuine, "complete," "incomplete," and "incidental," "engaged," or "total" views.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 10:  Documents regarding the termination of Your client relationship with Brunswick.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 11:  Documents regarding the termination of Your client relationship with Six Flags.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 12:  Documents regarding the termination of Your client relationship with Chesapeake Energy.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 13:  Documents regarding the termination of Your client relationship with Williams Energy.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 4**

REQUEST FOR PRODUCTION NO. 14:  Documents regarding the termination of Your client relationship with LeapFrog.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO.15:  Documents between You and Defendant.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 16:  Documents that set forth billing entries, statements, or invoices relating to Your employees that worked on NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 17:  Documents regarding NRA TV's financials, projections, estimates, forecasts, and/or predications concerning NRA TV in 2016.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 18:  Documents regarding NRA TV's financials, projections, estimates, forecasts, and/or predications concerning NRA TV in 2017.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 19:  Documents regarding NRA TV's financials, projections, estimates, forecasts, and/or predications concerning NRA TV in 2018.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 20:  Documents regarding NRA TV's financials, projections, estimates, forecasts, and/or predications concerning NRA TV in 2019.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 21: Documents referring to or relating to the actual measurement of unique views of NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 22:  Documents referring or relating to any commercial sponsorships of NRA TV including but not limited to documents referring to what You charged each sponsor and documents referring to Your profit from each sponsorship.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 23:  Documents that set forth Your financial statements from 2016-2019.

RESPONSE:  AMc objects to this request because it fails to specify the items to be

produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 24:  Documents that set forth or analyze the viewership analytics of NRA TV, including but not limited to documents that refer to any communications among or between the Defendant and Mr. McQueen concerning NRA TV viewership analytics.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 25:  Documents that set forth Your ideas, plans, and developments that administered NRA TV's content.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 26:  Documents referring or relating to Your employees' time sheets concerning NRA TV and associated matters.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 27:  Documents regarding or relating to any request by the NRA for unique viewership data for NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 7**

viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 28:  Documents regarding or relating to any request by the NRA for completed viewership data for NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 29:  Documents regarding the board meetings You held concerning NRA TV's viewership analytics.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 30:  Documents regarding the employee meetings You held concerning NRA TV's viewership analytics.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 31:  Documents that support Your allegation in paragraph 1 of the original complaint that Defendant's statements were to hurt AMc's standing and improve the NRA's standing.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.  The content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 8**

that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 32:  Documents that support Your allegation in paragraph 1 of the original complaint that Defendant's statements caused You money damages.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.

REQUEST FOR PRODUCTION NO. 33:  Documents that support Your allegation in paragraph 1 of the original complaint that this case is driven by the NRA and LaPierre's "sinister" and intentional efforts to destroy Your business.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.  The content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 34:  Documents that support Your allegation in paragraph 2 of the original complaint that Defendant has aligned himself with the NRA and LaPierre.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.  The content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 35:  Documents that support Your allegation in paragraph 25 of the original complaint that Defendant's statements concerning NRA TV's work environment were false.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.

REQUEST FOR PRODUCTION NO. 36:  Documents regarding Chickasaw Nation's audit of Your billing practices including but not limited to the actual audit.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 9**

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 37:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on October 24, 2017.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 38:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on November 28, 2017.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 39:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on January 3, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 40:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on February 1, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be

produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information. Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 41: All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on February 19, 2018.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information. Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 42: All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on April 11, 2018.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information. Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 43: All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on September 4, 2018.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information. Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 44: All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on October 11, 2018.

RESPONSE: AMc objects to this request because it fails to specify the items to be

produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 45:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on October 23, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 46:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on October 30, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 47:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on November 28, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 48:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on December 5, 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be

produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 49:  All documents regarding the meeting You held with the NRA to discuss NRA TV viewership on January 18, 2019.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 50:  Documents that support your allegation in paragraph 19 of the original complaint regarding Defendant's attempt to align with the NRA to form a "smear campaign" against You.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity and seeks information that is protected by the attorney-client privilege and work product doctrine.  The content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 51:  Documents that set forth the charges, costs and profits of NRA TV's live streaming.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 52:  Documents that support Your allegation in paragraph 29 of the original complaint that live programming was the quickest way to get messaging out after a tragedy.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 13**

REQUEST FOR PRODUCTION NO. 53:  Documents that support Your allegation in paragraph 29 of the original complaint that the analytics presented to the NRA showed that NRA TV became the go to source for information after the Parkland school shooting.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 54:  Documents that support Your allegation in paragraph 30 of original complaint that You expanded the footprint of NRA TV at the NRA's and LaPierre's express direction.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 55:  Documents that support Your allegation that You had "concerns" with NRA's direction under LaPierre beginning in 2018.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 56:  Documents that support Your allegation in paragraph 23 of the original complaint that Josh Powell was trying to get You to promote the insurance portion of Carry Guard but referred to Carry Guard as an "insurance scheme."

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 57:  Documents that support Your allegation in paragraph 32 of the original complaint that You have always been an enthusiastic proponent of Carry Guard's training program.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 58:  Documents that support Your allegation in paragraph 34 of the original complaint that the NRA and LaPierre showed no intention

to execute School Shield's mission.

RESPONSE:   AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 59:   Documents that support Your allegation in paragraph 32 of the original complaint that LaPierre systemically disassembled Carry Guard.

RESPONSE:   AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 60:   Documents that support Your allegation in paragraph 34 of the original complaint that You expressed reservations about NRA's approach to School Shield.

RESPONSE:   AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 61:   Documents that support Your allegation in paragraph 35 of the original complaint that Defendant's affidavit was maliciously written.

RESPONSE:   AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.  However, the content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 62:   Documents that support Your allegation in paragraph 37 of the original complaint that Defendant's affidavit was used in the media to "deflect attention" from LaPierre's and the NRA's other pending litigation.

RESPONSE:   AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.  However, the content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 63:   Documents that support Your allegation in paragraph 38 of the original complaint that since the NRA has hired Brewer, LaPierre set out to intentionally destroy the relations between You and the NRA.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for information that is irrelevant, and is not reasonably calculated to lead to the discovery of admissible evidence.  However, the content of the Stinchfield affidavit, the fact that it was drafted by the NRA's and LaPierre's lawyers, and the fact that it was disseminated directly to the media speaks volumes.

REQUEST FOR PRODUCTION NO. 64:  Documents that support Your allegation in paragraph 39 of the original complaint that Brewer is in competition with you as competing PR firms.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for information that is irrelevant, and is not reasonably calculated to lead to the discovery of admissible evidence.  However, the content of the Stinchfield affidavit, coupled with the fact that it was authored by the Brewer firm and disseminated directly to the media, speaks volumes.

REQUEST FOR PRODUCTION NO. 65:  All documents that set forth the contracts relating to the hiring of the "high profile" talent at NRA TV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic information involving third parties.

REQUEST FOR PRODUCTION NO. 66:  Documents that relate to Your allegation in paragraph 20 of the original complaint that Defendant's affidavit was falsely written and was sent straight to the media in order to further defame AMc.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.  AMc has, however, requested copies of communications between Defendant and his attorneys, on the one hand, and members of the media, on the other hand, which Stinchfield has refused to produce.

REQUEST FOR PRODUCTION NO. 67:  Documents that relate to Your allegation in paragraph 22 of the original complaint that the analytics are not only legitimate, but they were impressive across all of the same platforms that media companies everywhere use to judge success in engagement and reach.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 16**

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time

REQUEST FOR PRODUCTION NO. 68:  All documents relating to your allegations in footnote 1 of the original complaint that LaPierre believed Defendant to be a loose cannon who could not be trusted to do unscripted media appearances.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity.

REQUEST FOR PRODUCTION NO. 69:  All documents regarding payments You made to vendors that were fully reimbursed by the NRA.

RESPONSE: AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 70:  All documents referring or relating to any valuation of NRATV, the NRATV brand, or the valuations of parts of NRATV (e.g., NRATV TV shows) or NRATV brand, including but not limited to, any analyses regarding the same.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 71:  All documents that reflect unsuccessful client proposals.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 17**

REQUEST FOR PRODUCTION NO. 72:  All documents concerning the performance, significance, and/or importance of the live broadcasting portion of NRATV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.  Upon entry of a suitable protective order, AMc will produce copies of the video analytics and viewership statistics provided to the NRA from time to time.

REQUEST FOR PRODUCTION NO. 73:  All documents referring or relating to any sponsorships of NRATV.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, is not reasonably calculated to lead to the discovery of admissible evidence, and calls for the production of sensitive, nonpublic business information.

REQUEST FOR PRODUCTION NO. 74:  All Documents that relate to Youth for Tomorrow including but not limited to any donations, billings, invoices, and contracts between You and Youth for Tomorrow.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

REQUEST FOR PRODUCTION NO. 75:  All Documents regarding Your charitable and philanthropic giving.

RESPONSE:  AMc objects to this request because it fails to specify the items to be produced with reasonable particularity, calls for the production or irrelevant information, and is not reasonably calculated to lead to the discovery of admissible evidence.

Dated: March 12, 2020.

Respectfully submitted,

/s/ Brian Vanderwoude
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFF
ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2020, I served a true and correct copy of the

foregoing upon the following counsel of record:

William A. Brewer III
Ian Shaw
BREWER, ATTORNEYS & COUNSELORS
1717 Main Street, Suite 5900
Dallas, Texas 75201

/s/ Brian Vanderwoude
J. Brian Vanderwoude

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**REQUEST FOR PRODUCTION – PAGE 20**

# EXHIBIT B

| From: | Ian Shaw |
|---|---|
| To: | vanderwoude.brian@dorsey.com; mason.brian@dorsey.com |
| Cc: | William Brewer; Victoria Lee |
| Subject: | Meet and Confer Follow-Up Notes re AMc"s RFP objections |
| Date: | Wednesday, March 25, 2020 12:17:47 PM |

Counsel,

Thank you for the call. Below are some of the things that were agreed upon and discussed on our call today. I am sure we will meet and confer about these again soon.

AMc' Counsel agrees to:

- Draft and send a proposed protective order to Stinchfield's counsel on April 1, 2020. The protective order will encompass Request Nos. 9, 21, 24,27-30, 37-49, 53, and 67. (After reviewing the proposed PO another meet and confer will occur.)
- Requests Nos. 52, 54-64,66 re allegations in complaint Counsel will circle back to and discuss with client.
- Request Nos. 7-8, 17-20, 23, and 51  Counsel agreed to circle back to and ask the client about.
- Request Nos. 31-35, 50 Counsel stands strong on their privldlge stance but agreed to produce any non-privilege documents that are responsive to these requests. A priviledge log will need to be created for those docs that are being withheld as attorney-client privilege.
- Will check on sponsorship requests and any requests that were produced in other matters.

Stinchfield's Counsel agrees to:

- Request Nos 1-6, 10-14, 71, 74-75, Counsel stands firmly that a reputation is created over a span of time and documents responsive to that span of time are highly relevant. Counsel believes that this span can go back several years. AMc's counsel believes that it is too board and would like to have a more narrow time frame (20 years is too much) and a subject matter, which they can find responsive documents to produce relating to these requests. Also AMc counsel would like for Stinchfield to define "client complaints." Stinchfeild's counsel will follow up with AMc after consulting with his client.
- Request No 25, counsel will circle back to possibly narrow.
- Will check for documents concerning media outlets. To be clear again: Stinchfiled is not refusing to produce documents responsive to AMc's requests. Documents are being withheld under the protection of the work doctrine. If Counsel finds documents that are non-priviledged and not protected under the work product doctrine, counsel will produce those responsive documents if they exist.

Thanks
Ian

Sent from Mail for Windows 10

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC. | § | |
| | § | |
| v. | § | Case No. 3:19-cv-03016-X |
| | § | |
| GRANT STINCHFIELD | § | |

## AGREED PROTECTIVE ORDER

## 1.    PURPOSES AND SCOPE

1.1    Disclosure and discovery activity in this Action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this Action (as defined below) may be warranted.  Accordingly, the Parties hereby stipulate to and petition the Court to enter the following Stipulated Protective Order (the "*Order*").

1.2    The purpose of this Order is to facilitate the production of discovery material, facilitate the prompt resolution of disputes over confidentiality and privilege, protect material to be kept confidential and/or privileged, and ensure that protection is afforded only to material entitled to such treatment, pursuant to the Court's inherent authority, its authority under the applicable Rules, the judicial opinions interpreting such Rules, and any other applicable law.  Except as otherwise stated in this Order, a Party shall produce, in response to a valid discovery request, otherwise discoverable

information in its possession, custody or control that is Confidential or Highly Confidential, and such information shall be handled in accordance with the procedures set forth herein.

1.3    This Order and all subsequent Protective Orders shall be binding on all Parties and their counsel in the above-captioned litigation and any other persons or entities who become bound by this Order.

1.4    The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles.  The Parties further acknowledge, as set forth in Section 12.3 below, that this Order does not entitle them to file confidential information under seal.

## 2.    <u>DEFINITIONS</u>

The following definitions apply for purposes of this Order:

2.1    <u>Action</u>:  The lawsuit captioned above, *Ackerman McQueen, Inc. v. Grant Stinchfield*, Civil Action No. 3:19-cv-03016-X, pending in the United States District Court for the Northern District of Texas.

2.2    <u>Challenging Party</u>:  A Party or Non-Party that challenges the designation of information or items under this Order.

2

2.3     <u>Confidential Information</u>:  Discovery Material (regardless of how it is generated, stored, or maintained) or tangible things that qualify for protection under the Federal Rules of Civil Procedure and applicable precedent.

2.4     <u>Counsel</u>:  Outside Counsel of Record, In-House Counsel, or counsel retained for the purpose of advising, prosecuting, defending, or attempting to settle this Action.

2.5     <u>Designating Party</u>:  A Party or Non-Party that designates documents, information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" or "PRIVILEGED" or "HIGHLY CONFIDENTIAL."

2.6     <u>Discovery Material</u>:  All items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, answers to interrogatories, documents, responses to requests for admissions, tangible things, and informal exchanges of information), that are produced or generated in connection with any discovery in this Action, whether formally or informally.

2.7     <u>Expert</u>:  A person retained by a Party or its Counsel to serve as an expert witness or consultant or technical advisor in this Action (as well as his or her employees and support staff).

2.8     <u>Highly Confidential Information</u>:  Discovery Material that meets the definition of "Confidential Information" and which the Designating Party reasonably

3

believes to be information reflecting non-public technical research, pricing and business strategy documents concerning a particular product or service, financial statements reflecting sales data, margin data, cost and expense data, human resources or personnel files, and/or profit and loss data, sales information relating to specific customers or classes of customers, non-public research, provided that the nonpublic information is actually secret because it is neither known to, nor readily ascertainable by, another person or entity that can obtain economic value from the disclosure or use of such information, the Designating Party has taken reasonable measures to maintain the secrecy of that information and the Designating Party derives independent economic value and a competitive advantage from the secrecy of that information, including, as the case may be, containing information where production of the materials on a confidential or non-confidential basis would nonetheless likely cause substantial harm.  Nothing herein precludes any Party from seeking additional protections not currently contemplated by this Order to be applied to any particular document or category of documents, including Highly Confidential Information.

2.9   <u>In-House Counsel</u>:  Attorneys who are employees of a Party to this Action. In House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10   <u>Non-Party</u>:  Any natural person, partnership, corporation, association, or other legal entity not named as a Party to this Action, and their counsel.

4

2.11    <u>Outside Counsel of Record</u>:  Attorneys who are not employees of a Party to this Action, but have been retained to represent or advise a Party to this Action and have appeared in this Action on behalf of that Party or are affiliated with a law firm that has appeared on behalf of that Party.

2.12    <u>Party</u>:  Any party to this Action.

2.13    <u>Privileged Material</u>:  Discovery Material protected from disclosure under the attorney-client privilege, work product doctrine, or any other privilege, immunity, or protection afforded or recognized by the Rules, including any such privilege or protection under applicable U.S. or foreign law, regulation or statute.

2.14    <u>Producing Party</u>:  A Party or Non-Party that produces Discovery Material in this Action.

2.15    <u>Professional Vendors</u>:  Persons or entities that provide litigation support services (*e.g.*, photocopying, videotaping, graphic support services, coding, translating, preparing exhibits or demonstrations, document review, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.16    <u>Protected Material</u>:  Any Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."

2.17    <u>Receiving Party</u>:  A Party that receives Discovery Material from a Producing Party.

5

2.18   <u>Virginia Action</u>: The consolidated lawsuits captioned *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, Case Nos. CL19002067, CL19001757, and CL19002886, pending before the Circuit Court for the City of Alexandria, Virginia.

## 3.   <u>SCOPE</u>

3.1   The protections conferred by this Order apply to Protected Material (as defined above) and also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, translations, or compilations of Protected Material; and (3) any oral, written, or electronic communications, testimony or presentations, including for purposes of settlement, by Parties or their Counsel that might reveal Protected Material.  However, the protections conferred by this Order do not cover information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order.

3.2   This Order and its protections apply for pre-trial purposes only.  The Parties will meet and confer at the appropriate time regarding any use of Protected Material at trial, which use shall be governed by a separate agreement or order.

## 4.   <u>DURATION</u>

4.1   Even after final disposition of this Action, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise

6

in writing or a court order otherwise directs.  Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; or (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.   **DESIGNATING PROTECTED MATERIAL**

5.1   <u>Manner and Timing of Designations</u>.  Except as otherwise provided in this Order (see, *e.g.*, Section 5.2.4 below), or as otherwise stipulated or ordered, Discovery Material that qualifies for protection under this Order must be clearly so designated at the time the material is disclosed or produced.  The Parties shall make Confidential and Highly Confidential designations in good faith to ensure that only those documents or testimony that merit Confidential or Highly Confidential treatment are so designated.  Either designation may be withdrawn by the Designating Party.  If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, the Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Designation in conformity with this Order requires the following:

5.2.1     *Marking*.  All or any part of a document, discovery response, or pleading disclosed, produced, or filed by a Producing Party may be designated Confidential or Highly Confidential by marking the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL") on the face of the document and each page so designated.  With respect to tangible items, the appropriate legend shall be marked on the face of the tangible item, if practicable, or by written notice to the Receiving Party at the time of disclosure, production, or filing that such tangible item is Confidential or Highly Confidential or contains such information.  With respect to documents produced in native format, the Electronically Stored Information Protocol, or ESI Protocol, to be entered in this Action shall govern the form and method for marking such documents as Confidential or Highly Confidential.

5.2.2     A Receiving Party shall exercise good faith efforts to ensure that any copies, print-outs of natively produced documents or data, excerpts, summaries, or compilations include a confidentiality legend that matches the confidentiality designation the Designating Party applied to the document, discovery response, transcript, or pleading.

5.2.3     *Timing*.  Except as otherwise provided herein, documents and other objects must be designated before disclosure or production.  In the event that a Producing Party designates some or all of a witness's deposition or other pre-trial

8

testimony (or related exhibits) Confidential or Highly Confidential, such designation may be made on the record of the deposition or hearing or within thirty (30) calendar days after receipt of the final transcript of such deposition or hearing. The specific page and line designations over which confidentiality is claimed must be provided to counsel for the Parties within thirty (30) calendar days of receipt of the transcript in final form from the court reporter except counsel may agree to extend such period. Deposition or pre-trial testimony shall be treated as Highly Confidential pending the deadline or, if applicable, extended deadline for designation. After the expiration of that period, the transcript shall be treated only as actually designated.

       5.2.4    For information produced in some form other than documentary and for any other tangible items, the Producing Party shall affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL." If the Protected Material is produced in an electronic form with a load file, the Designating Party shall note that there is Protected Material in the load file. If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s).

       5.2.5    *Inadvertent Failures to Designate.* Accidental or inadvertent disclosure of Protected Material—including Protected Material inadvertently disclosed by failure to redact as set forth in Section 11—does not waive the confidential status of

such information or any privilege or other protection attached thereto.  In the event that Protected Material is inadvertently disclosed without appropriate designations, any Party or Non-Party may thereafter reasonably assert a claim or designation of confidentiality, and the Producing Party shall promptly provide replacement media. Thereafter, the Receiving Party must promptly return the original information and all copies of the same to the Producing Party, or destroy the original information and all copies, and make no use of such information.  In the event that Protected Material is inadvertently disclosed to any person and such disclosure is not permitted by the terms of this Order, the Party making the inadvertent disclosure shall promptly notify the Producing Party of such inadvertent disclosure within ten (10) calendar days of learning of it and will make all reasonable efforts to ensure the original and all copies of inadvertently disclosed information are not used and are promptly returned or destroyed.

6. **CHALLENGING CONFIDENTIALITY DESIGNATIONS**

6.1    <u>Timing of Challenges</u>.  A challenge to a designation of confidentiality may be made at any time.  Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount it a challenge promptly after the confidentiality designation is made.

10

6.2   <u>Form of Challenge</u>.  The Challenging Party shall object to the propriety of the designation of specific material as Confidential or Highly Confidential by providing written notice to the Designating Party of each designation it is challenging and describing the basis for each challenge.  To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific Section of this Order.  The Designating Party or its counsel shall thereafter, within fourteen (14) calendar days, respond to such challenge in writing by either: (i) agreeing to remove the designation; or (ii) stating the reasons for such designation.  Counsel may agree to reasonable extensions.

6.3   <u>Meet and Confer</u>.  If the Challenging Party continues to dispute the designation(s) at issue, it shall notify the Designating Party in writing within seven (7) calendar days thereafter. Counsel may agree to reasonable extensions.  The Parties shall attempt to resolve each challenge in good faith by conferring directly (in voice-to-voice dialogue; other forms of communication are not sufficient).  A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet-and-confer process first or establishes that the Designating Party is unwilling to participate in the meet-and-confer process in a timely manner.

6.4   <u>Judicial Intervention</u>.  If the Parties cannot resolve a challenge without court intervention, the Challenging Party may move the Court for an order withdrawing the designation as to the specific designations on which the Challenging Party and the

11

Designating.  Party could not agree, within fourteen (14) calendar days of the Parties

agreeing that the meet-and-confer process will not resolve their dispute.  Each such

motion must be accompanied by a competent declaration affirming that the movant has

complied with the meet-and-confer requirements imposed in the preceding Section.

6.5     The burden of persuasion in any such challenge proceeding shall be on the

Designating Party.  While a challenge is pending, all Parties shall continue to afford the

material in question the level of protection to which it is entitled under the Designating

Party's designation until the Court orders otherwise.

6.6     If a Designating Party or the Court identifies or determines that material

that had been designated as Protected Material should no longer be so designated, that

material will no longer be subject to the restrictions designated herein for the treatment

of Protected.

## 7.     ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles.  A Receiving Party may use Protected Material that is

disclosed or produced by another Party or by a Non-Party in this Action only for

prosecuting, defending, or attempting to settle this Action, including any appeal(s), so

long as such use is permitted herein.  In addition, the parties may use in the Virginia

Action any Protected Material that is disclosed or produced in this Action, which shall

receive the same protections as set forth in this Order absent a court order otherwise.

Subject to the foregoing, Protected Material may be disclosed only to the categories of

12

persons and under the conditions described in this Order.  After the final disposition of the Action, a Receiving Party must comply with the provisions of Section 13 below (FINAL DISPOSITION).  Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

      7.1.1    Except as otherwise provided in this Order, Counsel in this Action and any of their agents shall be prohibited from sharing with anybody any Protected Material, or any information derived from or based on any Protected Material, in connection with any investigation, proceeding, or contemplated proceeding.

    7.2    <u>Restrictions on Use of Confidential Information</u>.  Unless otherwise ordered by the Court, permitted in writing by the Designating Party, or used in the Virginia Action, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

      7.2.1    the Receiving Party's Counsel (including their employees and support staff);

      7.2.2    the officers, directors, and employees of the Receiving Party to whom disclosure is reasonably necessary for this Action;

      7.2.3    experts retained by the Receiving Party or the Receiving Party's Counsel to whom disclosure is reasonably necessary for this Action;

13

7.2.4    the Court and its personnel, and any appellate court or other court (and their personnel) before which the Parties appear in this Action;

7.2.5    special masters or discovery referees appointed by the Court;

7.2.6    mediators and their staff;

7.2.7    court reporters and their staff, professional jury or trial consultants, mock jurors, and Professional Vendors to whom disclosure is reasonably necessary for this Action;

7.2.8    potential or actual witnesses in the Action to whom disclosure is reasonably necessary, unless otherwise agreed by the Designating Party or ordered by the Court;

7.2.9    the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information; and

7.2.10   any other person to whom the Designating Party, in writing, authorizes disclosure.

7.2.11   Any person or entity who receives information designated CONFIDENTIAL pursuant to this Protective Order shall (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "1."

7.3 <u>Restrictions on Use of Highly Confidential Information</u>.

APPENDIX_38 of 98

Unless otherwise provided for herein, information designated Highly Confidential by either party shall not be disclosed. However, notwithstanding the above, information designated in good faith as "HIGHLY CONFIDENTIAL" may be disclosed to counsel of record for AMc and Stinchfield and each of their respective employees or representatives who (1) agree to be bound by the terms of this Protective Order and (2) execute the document attached hereto as Exhibit "1"; provided, however, that such any representative shall not discuss, disclose, summarize, describe, characterize, or otherwise communicate or make available such information to any person or entity prohibited by this Protective Order from accessing HIGHLY CONFIDENTIAL information and/or documents. Similarly, information designated HIGHLY CONFIDENTIAL may be shared with experts and Court personnel, provided that the disclosing party obtains written assurance that such experts will protect the confidentiality of the information and that the Court personnel will keep such information under seal.

Notwithstanding anything herein to the contrary, HIGHLY CONFIDENTIAL information may not be disclosed or disseminated to William A. Brewer, III or to personnel within Brewer, Attorneys and Counselors who are members of the Public Relations Unit of the firm, including Travis Carter, Andrea Burnett, Katherine Unmuth, Holly Heidemanns, and Lea Gamino-Blum, unless and until relief is obtained from the Court.

15

## 8.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

8.1     If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any Protected Material, that Party must:

8.1.1     promptly notify in writing the Designating Party unless prohibited by law from doing so.  Such notification shall include a copy of the subpoena or court order;

8.1.2     promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Order.  Such notification shall include a copy of this Order; and

8.1.3     cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

8.2     If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any Protected Material before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission.  The Designating Party shall bear the burden and expense of seeking protection of its Protected Material, and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this Action to disobey a lawful directive from another court.

APPENDIX_40 of 98

**9.**   **A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS ACTION**

9.1     The terms of this Order are applicable to Protected Material produced by a Non-Party in this Action.  Such information produced by Non-Parties in connection with this Action is protected by the remedies and relief provided by this Order.  Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

**10.**   **UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL**

10.1   If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures; (b) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (c) make all reasonable efforts to retrieve all unauthorized copies of the Protected Material.

**11.**   **REDACTIONS ALLOWED**

11.1   Any Producing Party may redact from Discovery Material matter that the Producing Party claims is Privileged Material.  The Producing Party shall ensure that the redaction is obvious to the Receiving Party and specify the basis for the redaction as appropriate.  Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked.  If counsel for the Producing

17

Party agrees or if the Court orders that Discovery Material initially redacted shall not be subject to redaction or shall receive alternative treatment, and the Discovery Material is subsequently produced in unredacted form, then that unredacted Discovery Material shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

11.2    The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Confidential Information and Highly Confidential Information as set forth in Section 6.

11.3    Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

## 12.    MISCELLANEOUS

12.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future.  Any Party, entity, or person covered by this Order may at any time apply to the Court for relief from any provision of this Order. Subject to the agreement of the Parties or an order of the Court, other entities or persons may be included in this Order by acceding to its provisions in a writing served upon counsel for the Parties, with such writings to be filed with the Court if so directed.

18

12.2    <u>Right to Assert Other Objections</u>.  By stipulating to the entry of this Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order.  Similarly, no Party waives any right to object on any ground to use as evidence any of the material covered by this Order.

12.3    <u>Filing Protected Material</u>.   Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this Action any Protected Material. A Party that seeks to file under seal any Protected Material must do so pursuant to the local rules.

12.4    <u>Hearings and Appeals</u>

13.4.1 In the event that a Receiving Party intends to utilize Protected Material during a pre-trial hearing, such Receiving Party shall provide written notice no less than three (3) calendar days prior to the hearing, to the Producing Party and/or the Designating Party, except that shorter notice may be provided if the Receiving Party could not reasonably anticipate the need to use the document at the hearing three (3) calendar days in advance, in which event notice shall be given immediately upon identification of that need.  The use of such Protected Material during the pre-trial hearing shall be determined by agreement of the relevant Parties or by Order of the Court.

19

13.4.2 In the event that any Protected Material is used in any court proceeding in this Action or any appeal in connection with this Action, except for the use of Protected Material during trial, the manner of which shall be determined pursuant to Section 3.2, such Protected Material shall not lose its protected status through such use. Counsel shall comply with all applicable local rules and shall confer on such procedures that are necessary to protect the confidentiality of any documents, information, and transcripts used in the course of any court proceedings, including petitioning the Court to close the courtroom.

12.5    Reservations. Entering into, agreeing to or complying with the provisions of this Order shall not:  (1) operate as admission that any particular material contains Protected Material; or (2) prejudice any right to seek a determination by the Court (a) whether particular material should be produced, or (b) if produced, whether such material should be subject to the provisions of this Order.

## 13.    FINAL DISPOSITION

13.1    Within ninety (90) calendar days after the final disposition of this Action, as defined in Section 4, each Receiving Party, including its employees, attorneys, consultants, and experts, must use commercially reasonable efforts to destroy or return to the Producing Party all Protected Material, exception (1) backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice, or (2) documents that must be

20

preserved as federal records or in compliance with other statutory, regulatory or legal authorities.  As used in this Section, "all Protected Material" includes all originals, copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material.  Whether the Protected Material is returned or destroyed, upon request of the Producing Party, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 90-day deadline that (1) states that commercially reasonable efforts have been made to assure that all Protected Material has been returned or destroyed, and (2) affirms that the Receiving Party has not retained any originals, copies, abstracts, compilations, summaries, or any other format reproducing or capturing any of the Protected Material.  Notwithstanding this provisions, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product (including all emails attaching or referring to Protected Materials), and consultant and expert work product, even if such materials contain Protected Material.  Any such archival copies that contain or constituted Protected Material remain subject to this Order as set forth in Section 4 (DURATION).

21

IT SO ORDERED.

DATED: _____          _____

Hon. Brantley Starr
United States District Judge

22

**EXHIBIT 1 TO PROTECTIVE ORDER**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC. | § | |
| | § | |
| v. | § | Case No. 3:19-cv-03016-X |
| | § | |
| GRANT STINCHFIELD | § | |

**ACKNOWLEDGEMENT OF AND**
**AGREEMENT TO BE BOUND BY PROTECTIVE ORDER**

I, the undersigned, state that I have reviewed the Protective Order in this matter

and hereby agree to be bound by and comply with the terms of the Protective Order.  I

submit to the jurisdiction of this Court for enforcement of the Protective Order.

SIGNED on this _____ day of _____ 202___.


_____
Signature


_____
Typed or Printed Name

# EXHIBIT D

| | |
|---|---|
| **From:** | Ian Shaw |
| **To:** | vanderwoude.brian@dorsey.com |
| **Subject:** | Meet and confer notes |
| **Date:** | Monday, June 22, 2020 10:35:13 AM |
| **Attachments:** | image001.png |

Brian,

Thanks for the call today. AMc will produce documents July 6, 2020. Below are what we agreed on re production.

- #15: AMc will produce documents concerning emails to, from and, cc per Stinchfield's work email address: grant@nratv.com
- #16: Billing entries, statements and invoices relating to your employees that worked on NRA TV. AMc will check with client about.
- #52: AMc will produce emails between NRA and AMc re live viewership and any internal communications re Live viewership.
- #54: AMc will produce emails and correspondences between NRA and AMc re NRA TV's progress and the NRA's footprint.
- #55: AMc will produce emails and correspondences between AMc and NRA (and internally at AMc) re WLP's leadership from 2016-2019.
- #56, 57, 59: AMc will produce emails between AMc and Powell and AMc and the NRA re Carry guard and any internal communications re carry guard; emails between Stinchfield and Amc (may overlap with #15)
- #58-60: AMc will produce emails and correspondences between NRA and AMc re school shield and any internal communications re School shield; emails between Stinchfield and AMc (may overlap with #15)
- #64: AMc will produce emails or any type of documents that shows Brewer and AMc are in competition.
- #68: AMc will produce emails between AMc and NRA re Stinchfield being a loose cannon; emails internally among AMc re Stinchfield being a loose cannon; emails between AMc and WLP re Stinchfield.
- Billing: AMc will produce any correspondences between former clients, current clients, former vendors, or current vendors re complaints concerning billing.
- Stinchfield will produce documents regarding media inquiries concerning Stinchfield's affidavit.

As stated before we object to the proposed protective order and we will most likely move against the protective order.

Thanks
Ian

**Ian Shaw** | Associate  Brewer, Attorneys & Counselors   1717 Main Street, Suite 5900  Dallas, Texas75201  Office:214.653.4025
ins@brewerattorneys.com | www.brewerattorneys.com



This communication (including any attachments) is intended for the sole use of the intended recipient, and may contain material that is confidential, privileged, attorney work product, and/or subject to privacy laws. If you are not the intended recipient, you are hereby kindly notified that any use, disclosure, or copying of this communication or any part thereof is strictly prohibited. If you have received this
communication in error, please delete this communication, including any copies or printouts, and notify us immediately by return email or at the telephone number above. Brewer, Attorneys and Counselors asserts in respect of this communication all applicable confidentiality, privilege, and/or privacy rights to the fullest extent permitted by law. Thank you.

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § | |
| **PLAINTIFF AND COUNTER-DEFENDANT,** | § | |
| **AND** | § | |
| **WAYNE LAPIERRE,** | § | |
| **THIRD-PARTY DEFENDANT,** | § | |
| **V.** | § | **CASE NO. 3:19-CV-2074-G-BK** |
| **ACKERMAN MCQUEEN, INC.,** | § | |
| **DEFENDANT AND COUNTER-PLAINTIFF,** | § | |
| **AND** | § | |
| **MERCURY GROUP, INC. ET AL.,** | § | |
| **DEFENDANTS.** | § | |

## ORDER

Pursuant to the District Judge's *Order*, Doc. 99, the National Rifle Association of America's ("NRA") *Motion to Enter Proposed Protective Order for Non-Parties*, Doc. 50, is before the Court for determination. For the reasons stated below, the Court adopts Defendants' proposed protective order and **DENIES** the NRA's motion, Doc. 50.

## I. BACKGROUND

The NRA and its CEO, Wayne LaPierre ("LaPierre"), bring this civil action asserting claims based on the termination of a long time business relationship between the NRA and Defendant Ackerman McQueen, Inc. ("Ackerman"), a public relations agency, and Mercury Group, Inc. (collectively, "AMc"), a wholly-owned subsidiary of Ackerman that specializes in public communications strategy. Doc. 18 at 1, 6, 9. The NRA also brings claims against three Ackerman executives (collectively, with AMc, "Defendants"). Doc. 18 at 7.

As of the date of this Order, the NRA has initiated three additional lawsuits against

Defendants, which have been consolidated and are pending in Virginia.  Doc. 31 at 105 n.40;

Doc. 53 at 2 (the "Virginia lawsuit").  In the Virginia lawsuit, the parties agreed to a protective

order with two tiers of confidentiality.  Doc. 56 at 119-20 (permitting parties to designate

discovery as Confidential Information or Highly Confidential Information).  In this action, the

parties agree on the need for a protective order, but disagree on its terms.  In short, the NRA and

LaPierre propose a protective order with one tier of confidentiality ("Confidential Information")

while Defendants propose a protective order with two tiers ("Confidential Information" and

"Highly Confidential Information").

## II.  APPLICABLE LAW

A court may issue a protective order, upon a showing of good cause, "to protect a party

or person from annoyance, embarrassment, oppression, or undue burden or expense."  FED. R.

CIV. P. 26(c)(1).  When parties to an action agree on the entry of a protective order, but differ on

the order's terms, the party seeking to limit discovery bears the burden of demonstrating that

"good cause" exists for the level of protection sought.  *Document Gen. Corp. v. Allscripts, LLC*,

Case No. 6:08-CV-479, 2009 WL 1766096, *2 (E.D. Tex. June 23, 2009).  "The party

attempting to establish good cause must demonstrate 'a clearly defined and serious injury to the

party seeking closure.'"  *Id.* (quoting *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d

Cir. 1994)).

## III.  PARTIES' ARGUMENTS

The NRA's requested protective order proposes a one-tier level of confidentiality,

granting "non-parties the ability to designate discovery materials confidential, if appropriate."

2

Doc. 50 at 2; Doc. 51 at 270 (defining "Confidential Information" as "things that qualify for protection under the Federal Rules of Civil Procedure and applicable precedent"). In response, Defendants propose two tier levels of confidentiality, allowing discovery materials to be designated Confidential Information[1] and Highly Confidential Information. Doc. 51 at 33. Defendants propose that Highly Confidential Information "may not be disclosed or disseminated to William A. Brewer, III ["Brewer"] or to personnel within Brewer, Attorneys and Counselors who are members of the Public Relations Unit of the firm . . . ." Doc. 51 at 43. The Brewer Firm is the NRA's counsel as well as a public relations provider. Doc. 51 at 86-87. Defendants aver that their proposed protective order is substantially identical to the protective ordered entered in the related Virginia lawsuit, which the NRA itself had proposed. Doc. 53 at 2. Defendant's argue that if this Court's order is less restrictive, "Brewer and his firm will use this case to circumvent the Virginia protective order to obtain highly confidential, competitive information to severely prejudice AMc—especially true of customer and financial information." Doc. 51 at 5. Meanwhile, the NRA and LaPierre contend that Brewer and AMc are not direct competitors as their size and services significantly vary. Doc. 61 at 7-10; Doc. 103 at 6. The Court agrees with Defendants.

## IV.  ANALYSIS

Because Defendants' proposed version of the protective order is more restrictive than the NRA's, the burden of establishing good cause for the level of protection sought falls on them. *See Document Gen. Corp.*, 2009 WL 1766096, *2. The Court has reviewed (1) the NRA's proposed protective order, Doc. 51 at 268-86; (2) Defendants' proposed protective order, Doc.

---

[1] Defendants' definition of Confidential Information is identical to the NRA's definition. Doc. 51 at 33, 270.

3

51 at 31-48; (3) the protective order the parties agreed to in the Virginia lawsuit, Doc. 56 at 118-35; and (4) the parties' briefing.  Upon consideration, the undersigned finds that Defendants have established good cause and demonstrated "a clearly defined and serious injury" to warrant the additional protection they seek—namely, the inclusion of the Highly Confidential Information designation.  *Document Gen. Corp.*, 2009 WL 1766096, *2.

The Court finds Defendants' argument that the NRA is attempting to circumvent the Virginia protective order highly persuasive.  The NRA all but concedes this point in its proposed protective order, which states "[d]ocuments designated 'Highly Confidential' for purposes of the Virginia Action shall be treated as 'Confidential' for purposes of this Action.'"  Doc. 51 at 270.

Even though the NRA and LaPierre insist that Brewer and AMc are not competitors, the Court notes that Brewer and AMc both provide public relation services.  *See* Doc. 31 at 96 ("Brewer entered the scene offering the NRA legal services while vying for the public relations work then being handled by AMc.").  In fact, the Parties argued this very issue in the Virginia lawsuit.  Doc. 51 at 79-110 (Tr. of Hr'g on protective order).  Upon review of the transcript, this Court agrees with Judge Dawkins' conclusion that Brewer and its PR unit should be walled off from information designated as Highly Confidential Information.  Doc. 51 at 110. Indeed, if Brewer had access to AMc's Highly Confidential Information—which includes non-public financial statements, profit and loss data, and sales information relating to specific customers—then Brewer could use that competitive information to severely prejudice AMc.  Doc. 51 at 33.

Accordingly, Defendants have established good cause and demonstrated "a clearly defined and serious injury" to warrant the inclusion of the Highly Confidential Information designation in the parties' protective order.  *Document Gen. Corp.*, 2009 WL 1766096, *2.

4

# V.  CONCLUSION

For the foregoing reasons, the NRA's *Motion to Enter Proposed Protective Order for Non-Parties*, Doc. 50, is **DENIED**.  The Court adopts Defendants' proposed protective order, Doc. 51 at 31-48, which will be issued separately.

**SO ORDERED** on June 22, 2020.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

5

# EXHIBIT F

MANAGERIAL AND DECISION ECONOMICS
*Manage. Decis. Econ.* **23:** 157–169 (2002)
DOI: 10.1002/mde.1059

# Competitor Identification and Competitor Analysis: A Broad-Based Managerial Approach

Mark Bergen[a,†] and Margaret A. Peteraf[b,*]

[a] *Carlson School of Management, University of Minnesota, 321 19th Avenue South, Minneapolis, MN 55455, USA*
[b] *Tuck School of Business at Dartmouth College, 100 Tuck Hall, Hanover, NH 03755, USA*

**Managerial myopia in identifying competitive threats is a well-recognized phenomenon (Levitt, 1960; Zajac and Bazerman, 1991). Identifying such threats is particularly problematic, since they may arise from substitutability on the supply side as well as on the demand side. Managers who focus only on the product market arena in scanning their competitive environment may fail to notice threats that are developing due to the resources and latent capabilities of indirect or potential competitors. This paper brings together insights from the fields of strategic management and marketing to develop a simple but powerful set of tools for helping managers overcome this common problem. We present a two-stage framework for competitor identification and analysis that brings into consideration a broad range of competitors, including potential competitors, substitutors, and indirect competitors. Specifically we draw from Peteraf and Bergen's (2001) framework for competitor identification to develop a hierarchy of competitor awareness. That is used, in combination with resource equivalence, to generate hypotheses on competitive analysis. This framework not only extends the ken of managers, but also facilitates an assessment of the strategic opportunities and threats that various competitors represent and allows managers to assess their significance in relative terms. Copyright © 2002 John Wiley & Sons, Ltd.**

## INTRODUCTION

Competitor identification is a key task for managers interested in scanning their competitive terrain, shoring up their defenses against likely competitive incursions, and planning competitive attack and response strategies. It is a necessary precursor to the task of competitor analysis, and the starting point for analyzing the dynamics of competitive strategy (Smith *et al.*, 1992). Before one can assess the relative strengths and weaknesses of rivals, or track competitive moves and countermoves, one must first identify the competitive set and develop an accurate sense of the

domain in which strategic interactions are likely to occur.

The purpose of this paper is to provide a set of tractable frameworks for competitor identification and competitor analysis that facilitate broad environmental scanning. To inform our frameworks, we borrow from Peteraf and Bergen's (2001) framework for competitor analysis. Their work borrows from Chen's (1996) model of competitor analysis, adapting his constructs to our purposes by drawing on the marketing literature on consumer behavior (Levitt, 1960; Nedungadi, 1990; Peter and Olson, 1993, Mowen and Minor, 1995). Specifically, we bring into sharp focus the role of customer needs in defining the marketplace to show how a greater recognition of customer needs can expand awareness of what lurks on the competitive horizon. This allows us to address a supply side bias that is often present in

*Correspondence to: Tuck School of Business at Dartmouth college, 100 Tuck Hall, Hanover, NH 03755, USA. E-mail: peteraf@dartmouth.edu
†mbergen@csom.umn.edu

Copyright © 2002 John Wiley & Sons, Ltd.

other approaches to competitor identification (Clark and Montgomery, 1999). Moreover, we use this to develop a hierarchy of competitor awareness that is central to our hypotheses on competitor analysis. Further, we introduce the concept of resource equivalence to facilitate the comparison of the abilities of indirect and potential competitors to meet the same set of customer needs as direct competitors. This allows us to offer a differentiated approach to competitor analysis.

From a theoretical standpoint, our frameworks contribute to the development of the stream of literature in strategic management on competitive dynamics (Smith *et al.*, 1992; Chen *et al.*, 1992; Chen and MacMillan, 1992; Miller and Chen, 1994; Chen and Hambrick, 1995; Ferrier, *et al.*, 1999; Grimm and Smith, 1997) and indeed anchor this literature at its logical starting point. From a practical standpoint, our approach offers a markedly different perspective on competitor identification and analysis, which has important implications for managers. Moreover, it provides a mechanism for evaluating competitive threats and opportunities by comparing firms on the basis of their capabilities to meet market needs.

## THE MOTIVATION

Competitor identification serves as an important function in several fields. In industrial organization economics, it is associated with the task of defining markets, which is critical for antitrust and regulatory policy. In marketing, it supports the analysis of pricing policies, product design, development and positioning, communications strategy, and channels of distribution. In strategic management, it provides a foundation for competitor analysis and the analysis of industry structure, conditions of rivalry, and competitive advantage.

One important objective of competitor identification is to increase managerial awareness of competitive threats and opportunities. To maximize awareness, it is essential to survey the competitive landscape broadly in the initial stages of analysis. This can help managers avoid the dangers of a myopic approach to competitive strategy and will minimize the chance of being blindsided. It can reduce a firm's vulnerability to competitive blindspots (Zajac and Bazerman, 1991), which are particularly troublesome in

settings in which industry boundaries are not well defined or are very fluid and changeable. For example, in emerging industries, in turbulent, high velocity environments (Eisenhardt and Bourgeois, 1989), or in hypercompetitive contexts (D'Aveni, 1994), there may be a temptation for managers to pay attention only to competitors who display a product or technology overlap, because these competitors are salient and because the task of broad scanning is difficult. However, it is in these settings that competitive encroachments and incursions across boundaries by indirect and potential competitors may prove to be the greatest threat.

A variety of approaches have been developed to address the task of competitor identification that are congruent with market definition. Sophisticated quantitative approaches to defining markets include the analyses of cross-price elasticities, of residual demand curves, of price correlations, and of trade flows using methods such as the Elzinga–Hogarty approach (Elzinga and Hogarty, 1978).[1] Scheffman and Spiller (1987) provide an overview of classical quantitative approaches to market definition.

Qualitative methods tend to be more ad hoc and are based on the idea that products are in the same market if they are close substitutes. Products are judged to be close substitutes when they are similar in terms of their performance characteristics, occasions for use, and when they are sold in the same geographic market (Besanko *et al.*, 1996). Qualitative methods derived from economics rest on the notion that a market is defined as a 'set of suppliers and demanders whose trading establishes the price of a good' (Stigler and Sherwin, 1985). Cognitive methods, in which managers and /or customers are queried about which products are in competition, are more common in the field of organization theory, which views markets as social constructions (See, for example, Porac and Thomas, 1990; Porac *et al.*, 1995; Auty and Easton, 1990).

Regardless of the analytical approach employed, conceptually it is generally accepted that competitor identification requires the simultaneous consideration of both demand side and supply side attributes of putative competitors and their domain (Abell, 1980; Day, 1981; Porac and Thomas, 1990; Scherer and Ross, 1990; Chen, 1996). Demand side considerations ensure that products are substitutable in the eyes of consu-

Copyright © 2002 John Wiley & Sons, Ltd.

mers. They include an analysis of the degree to which products fulfill similar functions and address similar needs. Supply side considerations address the degree to which firms are similar in term of technological and production capabilities.

In practice, however, commonly employed approaches to competitor identification display biases toward one side or another. For example, in industrial organization economics-based approaches, SIC codes (recently replaced by NAICS), have been employed often to delineate market boundaries, resulting in a supply side bias (Curran and Goodfellow, 1990). These codes are determined on the basis of technological as well as product commonalties, which are essentially supply side factors only. Recent experimental evidence suggests that cognitive views of markets, championed by Porac and Thomas (1990) as a basis for competitor identification, are subject to supply side biases as well (Clark and Montgomery, 1999).

The problem of bias in market definition is not a trivial one. Awareness is key to organizational action and is a principle driver of competitive attack and response (Chen, 1996). If the approach to market definition is too narrow in scope, then managers may be unaware of activity with competitive relevance and may find themselves blindsided by a surprise attack. Further, they may be unable to identify attractive market opportunities because a narrow view of the market blinds them to alternative venues in which their capabilities may be employed to advantage.

Consider, for example, the irony of the battle that took place in the 1970s between Polaroid and Kodak over the instant camera market (Porter, 1983). These two formidable rivals were drawn into a series of enormously costly price wars and legal battles with one another. While they were so engaged, their markets were being eroded by the arrival of 1-h photo shops, camcorders, and camera systems that did not require film. Their focus on one another as rivals may have prevented them from seeing the larger picture. And the opportunity cost of their private battle may have been the chance to prepare for the greater competitive challenge that lay on their horizon.

Few practical tools have been developed to assist managers with the task of identifying and analyzing competitors that span traditional product market boundaries. Other approaches to competitor identification are congruent with the task of market definition because they are concerned with identifying only close competitors. This can be limiting, particularly in the contexts of rapid innovation and of cooperation among multimarket firms (Hruska, 1992). Our framework goes well beyond this, since one of its purposes is to maximize managerial awareness of competitive opportunities and threats. We define competitors far more broadly to include not only close competitors but more distant competitors in the form of less obvious substitutors and potential competitors as well. In this way, we answer the call of Smith *et al.* (1992) and Chen (1996) for a framework on competitive dynamics that includes potential competitors.

Moreover, in contrast to most other methods, our approach brings a clear consideration of customer needs into the analysis with respect to both demand and supply side issues.[2] As described in the next section, we provide a two-stage framework for competitor identification and analysis. In stage 1, we explore how Peteraf and Bergen's (2001) framework can be used to develop a hierarchy of competitor awareness that can be used to link competitor identification with competitor analysis. This approach addresses the potential supply side bias that often diminishes the effectiveness of other qualitative approaches (Curran and Goodfellow, 1990; Clark and Montgomery, 1999). In the second stage, we provide a framework for competitor analysis that evaluates and compares the competitors identified in stage 1 according to their capabilities for meeting customer needs. We argue that the theoretical content, the practical relevance, and the accessibility of our framework make it particularly valuable for practitioners as well as for educators and scholars.

## A TWO-STAGE FRAMEWORK

We develop our model in two stages for the following reasons. Firstly, there are two separate tasks to be performed: competitor identification and competitor analysis. While managers should take a broad approach to competitor identification to avoid competitive blindspots, they may want to hone in on groups of identified competitors separately in performing competitive analysis. Secondly, these two tasks require two separate functions. Competitor identification is essentially a categorization task (Rosch, 1978) that involves

Copyright © 2002 John Wiley & Sons, Ltd.

M. BERGEN *ET AL.*

classifying firms on the basis of relevant similarities. In contrast, competitor analysis is an evaluative task that goes beyond mere classification to compare rivals on the basis of relevant dimensions.

Thus, in the first stage, we draw from Peteraf and Bergen (2001) to take a broad-based approach to competitor identification, classifying candidate competitors on the basis of similarities in terms of their resource endowments and the market needs served. We do so by asking the simple question of *whether* two firms serve the same customer need presently or have the ability to do so in the near future. The aim of this stage of analysis is to help managers to maximize their awareness of competitive threats and to classify the types of competition that they face so that we may develop a hierarchy of competitor awareness that may be linked to competitor analysis.

In the second stage, we take an evaluative approach and ask the question of *how well* two firms serve the same need or how their capabilities compare. We relate that to our framework for competitor identification to develop a hierarchy of competitor awareness. We also introduce the notion of *resource equivalence* to help managers assess the strengths and weaknesses of their competition in terms of comparative capabilities. This takes our framework into the realm of competitor analysis and allows us to develop a series of propositions regarding the likelihood of attack and response from different types of competitors.

### Stage 1: Recognizing and Classifying the Competition

To identify and classify the competitive set, we draw from Peteraf and Bergen (2001) to propose the framework presented in Figure 1. [see Peteraf and Bergen (2001) for the original developments and a more detailed discussion of this framework for competitor identification.] We borrow from Chen's (1996) highly acclaimed paper, but adapt his constructs of market commonality and resource similarity to serve our different purposes. Specifically, under the category of market commonality, we sort competitors based on the degree to which they address similar customer needs, while under the category of resource similarity, we sort competitors based on the degree to which their resource endowment is similar in terms of type or composition.

Chen (1996, p.106) defines market commonality as 'the degree of presence that a competitor manifests in the markets it overlaps with the focal firm', a definition that serves as an indicator of a firm's 'direct or primary competitors' and their behavior (Chen, 1996 p.102). We broaden the definition to take the perspective that firms compete with one another to the extent that they satisfy the same customer needs. Accordingly, we redefine market commonality as *the degree to which a given competitor overlaps with the focal firm in terms of customer needs served.* This approach is consistent with the marketing literature (Levitt, 1960; Cooper and Inoue, 1996) and recognizes that competitors may include firms that do not share the same technological platform. It is consistent as well with the type of approach to market or niche overlap utilized in the population ecology literature (McPherson, 1983; Baum and Singh, 1994; Baum and Korn, 1996).[3]

Notice how the incorporation of customer needs changes awareness through a change in the assessment of the competitive structure. For instance, in analyzing the airline industry, a customer-needs-based analysis would suggest that the fundamental enduring need is for convenient transportation. In short, haul airline markets, there are a number of viable alternatives for consumers, including rail, automobile, bus, and limousine services. Similarly, Southwest Airlines' entry into the Northeast corridor through Islip posed a significant competitive threat to Amtrak. Our needs-based definition encourages managers to look beyond restrictive product market boundaries to assess competitive threats more broadly. It captures the extent to which direct and indirect competitors, such as substitutors, are in competition to serve the same needs.



**Figure 1.** Mapping the competitive terrain.

Copyright © 2002 John Wiley & Sons, Ltd.

*Manage. Decis. Econ.* **23:** 157–169 (2002)

Chen (1996, p.107) defines resource similarity as 'the extent to which a given competitor possesses strategic endowments comparable, in terms of both type and amount, to those of the focal firm'. We modify this definition slightly. Because we merely categorize firms by type of competitor in stage 1, reserving comparisons regarding relative competitive capabilities for stage 2 analysis, we do not consider resource amounts. We regard the amount of resources as one of the many dimensions on which a firm may claim resource superiority relative to other firms. For our purposes, we redefine resource similarity as *the extent to which a given competitor possesses strategic endowments comparable, in terms of type, to those of the focal firm.*

We utilize these two constructs of market commonality and resource similarity to categorize the competitive field from the point of view of a focal firm. Thus we employ dyadic comparisons between that firm and candidate rivals. By displaying resource equivalence as an increasing function on the *x*-axis and market commonality as an increasing function on the *y*-axis, we can map the competitive field of a focal firm by locating candidate rivals on the grid.

A firm that scores high in terms of both market commonality and resource similarity is one that serves the same market needs with the same types of resources as the focal firm. Firms such as these will be found in the northeast corner of the grid. These are the focal firm's *direct competitors*, as for example AMD is for Intel (both producers of microprocessors and suppliers to computer manufacturers).

Firms with resource endowments similar to the focal firm that do not presently serve the same customer needs will be found in the southeast corner of the grid. These are the set of *potential entrants* into the markets of the focal firm. For example, a caterer and a local restaurant may both compete on the basis of their reputations for good food and service, and similarly employ chefs, kitchen equipment, and the like. Although their resource similarity is high, they may nevertheless cater to demonstrably different customer needs. Corporate customers need caterers to prepare, deliver, and serve party foods and dinners for large functions held at the client's site; individuals patronize restaurants in small groups for a pleasurable dining experience away from home or for small-scale take-out service. While these two

businesses presently serve different needs, either could choose to branch out and enter the others' market since they already have most of the resources required to do so.

Firms that occupy the southwest corner of the grid score low on both dimensions. They are entirely outside the competitive set at present, although this could change over time as firms change their positions. Of greater interest is the set of firms in the northwest corner. These firms are serving the same market needs as the focal firm but with different types of resources. They comprise the set of *indirect competitors*, such as substitutors.

Substitutors are an important, but often invisible, class of competitors since they frequently utilize new technologies, whose costs are likely to decline due to the learning curve. For example, cameras may be used to take pictures with film-based technologies that depend on capabilities in chemistry and mechanics. Alternatively, digital pictures may be produced using electronics capabilities. The underlying consumer need (to record events pictorially) is served equally well by completely different technologies, as a result of which Sony and Kodak now compete (Friedman, 1999).

While this mapping exercise is fairly straightforward, our customer needs perspective introduces an important subtlety into the analysis that managers might otherwise overlook. Consider again the set of direct competitors. When consumers acquire information about available alternatives to fulfill a need, they generate an 'awareness set' that is subsequently honed down to make the choice problem easier (Peter and Olson, 1993). This reduced set, known in the field of marketing as the 'consideration set', is the set of options from which the eventual choice generally emerges. To the extent that more than one alternative is actively considered in the consideration set, those alternatives are the most significant competitors. In other words, the direct competitors identified by the mapping exercise may not *all* be immediate competitive threats, because only a subset of them may be in consumers' consideration sets. This suggests that the needs perspective can be used both broadly and more narrowly to generate a deep understanding of the variations and ambiguities in the competitive landscape.

There is an important strategic implication of this line of thinking. Consideration sets do not

162                                M. BERGEN *ET AL.*

exist in a vacuum. In fact, firms frequently attempt to influence the composition of the consideration set through a multitude of devices including comparative advertising, sales presentations, and shelf placements. Industry leaders attempt to assure that they are the sole members of the consideration set, and therefore rarely engage in comparative advertising that identifies a competitor. Conversely, firms that have weaker market positions attempt to develop psychological associations with industry leaders through comparative ads that specifically identify the principal competitor. Such associations allow weak firms to inveigle their way into customers' consideration sets.

This framework, then, is useful not only for increasing awareness of the various dimensions of the competitive landscape, but it can assist managers with attempts to influence the composition of the landscape as well. It is useful for identifying opportunities for collaborative and cooperative activities, such as joint advertising to increase industry demand, in addition to identifying and monitoring threats. Additionally, there are other practical implications of this framework. It can be used to view competition dynamically and to track potential competitors' movements over time. It serves to remind managers to track not only rivals' conduct in product markets, but their activities in factor markets as well. Activity in the resource market may provide a forewarning of impending competitive action in the product market.

The limitation to this part of the framework is that while it is useful for surveying the competitive terrain and classifying competitors, it cannot be used to order the terrain and rank competitive threats and opportunities. That is to say, it cannot be used to ascertain which competitors present the strongest threat to a focal firm and which are the most vulnerable to competitive attack. For this, we need additional information. Specifically, we need to be able to evaluate the differences in resource type, in terms of their abilities to satisfy a given set of market needs.[4] Knowing that the capabilities of two players differ is useful for simple classification purposes. But in order to predict which is the stronger competitor, we need to know how their capabilities differ and which set is better suited to the market needs being served. We turn to these issues in the second stage of our analysis.

## Stage 2: Evaluating the Competition and Predicting Rivalry

To facilitate evaluating the competition and making predictions regarding the likelihood of attack and response, we introduce the construct of resource equivalence. We define resource equivalence as *the extent to which a given competitor possesses strategic endowments capable of satisfying the same customer needs as the focal firm.* Although this is a continuous measure like the notion of resource similarity, we can conceive of it in terms of high and low degrees. If two firms have high resource equivalence, they come close to being equally capable of satisfying the same customer needs. Equal capability implies that they do or can address the same market needs equally well. For example, among supermarket chains, Kroger and Albertsons score high in terms of resource equivalence, and represent relatively balanced competitors nationwide, with approximately 1900 stores apiece in 1999.[5]

We utilize this construct to conduct competitor analysis by assessing the strength of various types of competitors relative to a focal firm, as we illustrate in Figure 2.

On the horizontal axis, we sort firms according to whether they have high-or low-resource equivalence relative to the focal firm. On the vertical axis, we sort firms according to the three basic competitive categories identified in the first stage of the analysis: direct competitors, potential competitors, and indirect competitors.

Note that there is relative balance in terms of competitive strength between the focal firm and its competitors on the right-hand side of matrix. For example, if the lower right-hand side of the matrix



| | Low | High |
|---|---|---|
| **Indirect Competitors** | e.g. Peapod vs. Albertsons | e.g. Wal-Mart vs. Albertsons |
| **Potential Competitors** | e.g. Canadian Safeway vs. Albertsons | (e.g. none) |
| **Direct Competitors** | e.g. Lunds/Byerly's vs. Albertsons | e.g. Kroger vs. Albertsons |
| | **Resource Equivalence** | |

**Figure 2.** A framework for competitor analysis.

Copyright © 2002 John Wiley & Sons, Ltd.

contains Kroger (in relation to Albertsons), the upper right cell might contain Wal-Mart's Supercenters, which presently are only a third of the size of the traditional supermarket chains (with lower scale and scope economies), but have superior capabilities in terms of information technology and logistics (see Note 5). It is a balanced package such that their set of capabilities, taken as a whole at this point in time, can meet customer needs about as well as the capabilities of Albertsons. The middle cell on the right might contain the large Canadian chain, Loblaw, that presently serves other geographic needs but with similar and equivalent capabilities.

On the left-hand side of the matrix, there is imbalance with respect to capabilities, implying that one rival is stronger than the other. For example, a small chain such as Lunds/Byerly's with its 19 stores would occupy the lower left cell, while middle-sized Canada Safeway might occupy the middle cell, and a small but growing Internet provider, such as Peapod, may be found in the upper left cell (see Note 5). At present, none of these competitors is a match for the superior capabilities of Albertsons to meet customer needs, although that could change over time. Note, more generally, that whereas this matrix is indicative of competitive imbalance, it does not reveal the directionality of the imbalance. Individual competitors occupying the left-hand side could be stronger or weaker than the focal firm.

We capture the relationship between competitive balance and resource equivalence with the following premise:

**Premise 1:**
As resource equivalence increases between a focal firm and a rival, the degree of competitive balance increases as well, *Ceteris paribus*.

While balance is the indicator that increases from left to right on this diagram, it is awareness that increases as we move from the bottom to the top. The reason for this is simple. Direct competitors have the most in common with the focal firm, since there is similarity in terms of both customer needs met and resource type. (This of course holds the level of resource equivalence constant.) They are uppermost in the minds of managers because of the salience of these types of similarities. The work by Reger and Huff (1993), and Lant and Baum (1995), Porac and Baden-Fuller (1989) on how managers perceive

competitors provides empirical support for these claims.

Potential competitors have similar resources as the focal firm but serve different market needs. Indirect competitors represent the reverse situation. Because of the supply side bias that we discussed in the previous section, managers pay greater attention to firms with similar technologies and resources when scanning their competitive environment than they do to firms that are outside traditional product market boundaries. For these reasons, we suggest the following:

**Premise 2:**
The awareness between a focal firm and its rivals decreases, *Ceteris paribus*, as we move from the class of direct competitors, to potential competitors, to indirect competitors.

Our analysis of the degree of rivalry in various segments of the competitive domain depends on an assessment of the two factors of balance and awareness. An understanding of the level of awareness between competitors is essential since awareness is one of the three fundamental drivers of competitive behavior, which also include motivation and capability.[6] As Chen (1996) makes clear, organizational action depends critically upon these three drivers. An understanding of the degree of competitive balance is important because it affects both capability, which is a relative phenomenon, and motivation, which depends in part upon the probability of success. For example, when there is balance, then the capability of one party to dominate in a competitive battle is low relative to the situation when there is imbalance. In this situation, there is a tendency toward what is known in the literature on multi-market competition as 'mutual forbearance' (Gimeno and Woo, 1996,1999; Baum and Korn, 1996, 1999; McGrath *et al.*, 1998). Balance also affects the motivation of competitors in that motivation is affected, in part, by the likelihood of success. If the level of balance is high, for example, then the probability of successfully defeating one's rival is low relative to an imbalanced situation in which one holds the advantage.

We use these premises to derive a series of logical propositions regarding the likelihood of attack and response from various competitive quarters. The most general of these follow from the effect of balance on rivalry. Balance inhibits the initiation of competitive action, since

Copyright © 2002 John Wiley & Sons, Ltd.

competitors have more to gain from forbearance than from competitive engagement. That is, the initiator's probability of success is lower and its probability of defeat is higher in a balanced situation. In addition, balance often encourages cooperative actions that may provide a win–win solution for the parties involved (Brandenburger and Nalebuff, 1996). When there is imbalance in terms of capabilities, advantaged rivals are motivated to capitalize on their situation, striking from strength against weakness, or using a judo strategy to turn an opponent's strength into a liability (Gelman and Salop, 1983; Yoffee and Cusumano, 1999). In summary, when the level of balance is high, the level of motivation for competitive attack is low. Because of the corresponding relationship between balance and resource equivalence, we propose the following:

**Proposition 1:**
As the resource equivalence between two firms increases, the likelihood of attack is reduced, *Ceteris paribus*.

Because there is greater balance on the right-hand side of the figure, the likelihood of response to attack is also greater on the right-hand side. The reason for this is that the capability of effective response is much higher when resource equivalence is high and the motivation is higher as well due to the higher probability of success. This, of course, assumes that other things that affect motivation, such as the gains from engaging in competitive action, are equal across conditions. Notice, parenthetically, that this high likelihood of a response to an attack is one of the things that motivate forbearance from attack in the first place. This reasoning leads us to our next proposition:

**Proposition 2:**
As the resource equivalence between two firms increases, the likelihood of response to a competitive attack increases, *Ceteris paribus*.

This proposition reinforces our third proposition, that rivalry is reduced among resource equivalent competitors. The reason for this argument is that firms will be even less likely to upset the competitive balance and attack if they know that their equally capable rival is likely to respond. They are better off accepting an uneasy truce than risking a costly and damaging competitive battle.

Along the two sides of the matrix, the properties of awareness and balance interact in interesting ways to yield further predictions regarding the likelihood of attack and response. Note first that although the likelihood of attack is generally lowest on the right-hand side of the diagram, it increases as we move from the bottom to the top cell. The reason for this is that as awareness of rivals decreases, the awareness of the balance decreases as well. Notice that it is more difficult to perceive resource equivalence when the capabilities differ by type and by composition, as in the Wal-Mart versus Albertsons example that we have already given. Thus, balance is less of a limiting factor in the uppermost cells on rivalry and opportunities for mutual understanding diminish due to the greater heterogeneity. Moreover, an aware rival may take advantage of the fact that on average, his competitive target is likely to be relatively unaware of competitive actions coming from an indirect competitor. This increases the probability of a successful assault and thus the motivation for action. In sum, we propose:

**Proposition 3:**
When the degree of resource equivalence is high, the likelihood of attack increases as we move from the class of direct competitors, to potential competitors, to indirect competitors.

The likelihood of response runs in the opposite order on the left-hand side. That is, balanced direct competitors are the most likely to respond to an attack, while indirect competitors are the least likely to respond. When there is balance in terms of resource equivalence, the capability for effective response is high. Because the motivation for action is dependent on an assessment of the likelihood of success, the motivation for response is high as well, other things equal (such as what is at stake). Even though there may be equivalent capabilities among indirect competitors, they are less likely to be perceived as equivalent. Moreover, rivals are likely to be less aware that indirect competitors are indeed competitors, and this reduced awareness should be accompanied by a reduction in responsiveness.

**Proposition 4:**
When the degree of resource equivalence is high, the likelihood of response decreases as we move

Copyright © 2002 John Wiley & Sons, Ltd.

from the class of direct competitors, to potential competitors, to indirect competitors.

The action and response expectations on the left-hand side of the matrix are just the reverse of those on the right. Thus, the likelihood of attack is greatest when imbalanced rivals compete directly and lowest when imbalanced rivals compete indirectly. The reason for this is that the awareness of a rivalrous opportunity will be greater among direct competitors than among potential competitors or indirect competitors. The propensity of managers to view rivals in terms of similar products along traditional market boundary lines means that they will choose opportunities to compete first in those venues. In addition, they may feel that they know better how to compete effectively within traditional market boundaries than across them. By remaining within these boundaries, they can utilize available organizational routines for competing locally and have a repository of knowledge regarding likely reactions and outcomes that are most applicable for such actions (Nelson and Winter, 1982). In sum:

**Proposition 5:**
When the degree of resource equivalence is low, the likelihood of attack decreases as we move from the class of direct competitors, to potential competitors, to indirect competitors.

Here the outcome is opposite for the likelihood of response. To understand this, one must first appreciate that when there is imbalance among rivals, the likelihood of effective response is small. This reduces the likelihood of response since both capability and motivation will be low, other things equal. What drives a lower response rate among indirect competitors relative to direct competitors on this side of the matrix is the lower awareness of the imbalance and its implications. That is, while indirect competitors are unlikely to see each other as rivals *a priori*, when attacked they are more likely to respond simply because the perception of imbalance is lower. They are more likely to believe that they have a chance of effective response, Ceteris paribus. This leads to the following prediction:

**Proposition 6:**
When the degree of resource equivalence is low, the likelihood of response increases as we move

from the class of direct competitors, to potential competitors, to indirect competitors.

We now turn to a discussion of the uses of our framework and its limitations in the section below.

## DISCUSSION

### Implications

Our frameworks can be helpful to strategists in a variety of ways. First, the stage 1 framework can be used in isolation as an aid to overcoming a natural tendency toward over weighting supply side factors in surveying the competitive environment and ignoring competition from beyond traditional product market boundaries. Second, it can be used to chart the movement of competitors to new positions along the grid. Thus, it can provide a more dynamic outlook of how the competitive situation is changing. Third, it can be used to look for new opportunities for competitive dominance. It can also be used to search for cooperative opportunities. Fourth, it can be used to design a strategy to influence customer needs, as well as their awareness sets and considerations sets. Thus, it can be used to change the competitive landscape on a variety of dimensions.

Stage 2 of the analysis has significant implications for managers as well. Not only do we believe that our propositions have predictive power regarding the likelihood of attack and response, but in addition, they can be used to order the competitive field in terms of threats and opportunities. For example, on the right-hand side of the matrix, it is clear that the degree of competitive threat increases from bottom to top if we view the competitive field dynamically. That is, over time the indirect competitors among those competitors with equivalent resources pose the greatest threats to a focal firm. This is consistent with Chen's prediction that the greatest competitive threat comes from rivals with low market commonality and high resource similarity. Applying this to our stage 1 framework suggests that potential competitors (with low market commonality and high resource similarity) may ultimately be more threatening than direct competitors (with high market commonality and high resource similarity), which accords with our predictions.

Copyright © 2002 John Wiley & Sons, Ltd.

Because stage 2 matrix indicates competitive imbalance, but does not show whether it is the rival or the focal firm that benefits from the imbalance, the left-hand side of the matrix reveals information about both opportunities and threats. If the focal firm is the holder of resources that are less capable of meeting market needs than its rival, then its greatest threat (over time) will be found among its direct competitors, since the propensity for attack is strongest and the propensity for response is weakest. If the focal firm is the advantaged party, then this cell presents its greatest opportunities for successful competitive engagement. More generally, the matrix reveals opportunities for cooperation, along the right-hand side and suggests that a firm seek competitive opportunities and threats along the left-hand side. Note that if the focal firm is less capable of meeting market needs than stronger rivals, its greatest competitive threat will come from the direct competitors in the lower left cell. These will comprise the competitive set that pose the most danger since the focal firm will be least able to respond effectively.[7] Further, it is in this cell that there is the least opportunity for cooperation. Cooperative opportunities are greatest on the right-hand side of the matrix. In addition, it is possible that relative capability among rivals is even more important in predicting rivalrous interactions than the awareness factor. While it may not be a more significant determinant in its own right, its effect is magnified since it affects motivation as well through its effect on the likelihood of success.

There are other managerial implications as well. Since the competitive threat is relatively high from indirect competitors with resource equivalence, managers should actively seek opportunities to find stable win–win solutions. An example of this is the recent set of agreements reached between Microsoft and Apple. Since the primary driver of increased likelihood of attack on this side of the matrix is reduced awareness of the competitive balance, managers should actively seek to educate their rivals regarding their resource equivalence. They should also seek to signal both their capability of an effective response to any attack and their willingness to respond in order to diminish further the probability of attack from all types of resource equivalent competitors.

When resources are not equivalent and the focal firm is in the superior position, managers should take steps to enhance awareness of their presence, so that rivals will recognize the futility of their position and refrain from response. If the focal firm is in the weaker position, its managers should seek to diminish awareness of this imbalance, so as not to invite an attack, or try to commit credibly to staying weak. They might also consider signaling that they believe that their capabilities are stronger than they are or that they will respond irrationally to an attack, in order to diminish attack probabilities. Finally, just as managers can use the stage 1 competitive terrain map to track competitive movements, so can they use stage 2 matrix to chart changes in resource equivalence and corresponding capabilities. They can use this information to prepare defenses against competitive incursions and to strengthen their position vis-a-vis rivals. For example, grocery chains such as Albertsons and Kroger have begun to consolidate to improve their capability to meet market needs efficiently as they have noticed Wal-Mart gaining strength with their hypermarkets and supercenters.

### Limitations

One limitation of our model is that, in contrast to Chen's (1996) model, it does not account for the relative importance of various market segments to the industry participants. Thus some market segments may be of greater strategic value to firms than others and may be worth fighting for more than others. This affects rivalry through its effect on motivation. We have assumed this effect to be constant throughout our analysis. Managers should be aware of this limitation and should factor in the relative importance of various market segments to their own firms and to rivals in making judgments regarding likely competitive reactions. In addition, managers should consider the growth rate of various market segments, since that will define the attractiveness of the turf under contention and will affect the level of rivalry (Porter, 1980).

Another limitation is that the model does not take into account the notion that some resources represent more potent competitive weapons than others and may also make rivals more immune to competitive attack. Our model addresses the questions of which firms are alike and which are superior, but not which are assailable. To an extent, these factors are built into our assumptions regarding the meaning of resource equivalence, but

Copyright © 2002 John Wiley & Sons, Ltd.

the underlying micro-level analysis is beyond the scope of this paper. By incorporating additional information regarding what drives competitive advantage from models such as the resource based view of the firm (Barney, 1991; Amit and Schoemaker, 1993; Peteraf, 1993), it is conceivable that the power of this model could be increased. This may be a fruitful avenue for future research.

The model is limited as well, in that it ignores the competition that can come from suppliers and customers, as Porter's (1980) five-forces model suggests. Neither does it take into account other forms of competition within a firm's 'value net' (Brandenburger and Nalebuff, 1996). Moreover, while the model has the capability to consider the role of complementors, we do not explicitly discuss this issue. Since complementors play a cooperative role more often than a competitive role, including them in stage 2 analysis may be misleading.

In addition, while the model can be used to an extent to track competitive movement, it lacks the richness of a truly dynamic model. It ignores factors of timing, such as the length of response delay, subsuming these issues instead into the 'likelihood' of response. Additional insight from the model might be possible if one built some consideration of the relative adjustment costs that various rivals face in altering their capability sets. See, for example, the Dierickx and Cools' (1989) discussion of capabilities and time compression diseconomies. See also the Grimm and Smith's (1997) discussion of response delays and other timing issues.

Finally, it is possible that the model's predictive power could be increased if it accommodated in explicit fashion an understanding of how the capabilities of rivals create value in terms of increasing perceived customer benefits and lowering costs. By delving more deeply into these aspects, one could predict even more cleanly where a firm's best opportunities and greatest threats lie. We reserve these possibilities for future work.

## CONCLUDING REMARKS

This paper makes its contribution to scholarship on four broad fronts. First, we extend the competitive dynamics literature to include the task of competitor identification. We do so in a way that is consistent with and complementary to the thinking in this research stream, facilitating seamless integration across the analytic tasks and contributing to a more complete overall model of competitive dynamics. Second, we focus attention on the role of the customer in defining competitors and show how a greater consideration of customer needs can expand managerial awareness of what lurks on the competitive horizon. Third, we introduce the notion of resource equivalence as a tool for evaluating competitors. This is a powerful construct that directs attention to competitive dimensions that matter at a fundamental level. Fourth, we use our hierarchy of competitor awareness and resource equivalence to generate hypotheses on competitive analysis.

The paper's contributions are not limited, however, to the world of academia. The frameworks and propositions in this paper also have strong implications for managers and for strategists. The paper provides a set of tools for scanning the competitive horizon that can help managers to lessen the probability of their being blindsided by a competitive attack. These tools can help managers take a more dynamic view of competition and think more strategically about competitive challenges that lie ahead. With a greater appreciation of the competitive dynamics of the broad environment in which they operate, they may become more proactive in responding to these challenges. They can also help managers to anticipate new opportunities that others might not see so readily, thus enabling them to move more quickly and take advantage of them as they arise. Finally, the tools for competitor analysis provided in this paper can also help managers to gain a deeper appreciation of what drives attack and response behavior. This will enable them to anticipate their rival's moves more accurately and to respond more rationally. As managers learn to navigate their competitive terrain with greater competency, they should see improvements in both the competitive position and performance of their firms, relative to more shortsighted rivals.

### Acknowledgements

The authors thank Ming-Jer Chen, Wally Ferrier, Paul Wolfson, Luohua Zhou, and Zeev Rotem for helpful discussions. We are grateful to Sourav Ray for his research assistance. In addition, we thank Orv Walker and his marketing strategy seminar participants at the University of Minnesota, as well as one anonymous reviewer. Special thanks to Akshay Rao for his fundamental contributions to this paper.

Copyright © 2002 John Wiley & Sons, Ltd.

## NOTES

1. See Besanko, Dranove, and Shanley (1996) for a description of these techniques.
2. Chen (1996) also provides a model of competitor analysis that accommodates a broad approach to the market. Our framework is differentiated from his in that it addresses explicitly the task of competitor identification (while his takes the market boundaries as given). In addition, it incorporates attending to customer needs as a basis for both identifying markets and comparing capabilities.
3. The organizational niche overlap concept is in turn related to the concept of domain similarity in the literature on interorganizational relationships. It refers to the extent to which firms obtain revenues from the same sources, have similar skill bases, and provide similar products and services (Baum and Singh, 1994).
4. More specifically, we are concerned with relative abilities to create value in a specific context.
5. From data compiled by the Retail Food Industry Center of the University of Minnesota.
6. These drivers are drawn from the literature on change, learning, and decision-making. See, for example, Schelling (1960), Allison (1971), Kiesler and Sproull (1982), Dutton and Jackson (1987), Lant, Milliken, and Batra (1992).
7. This is true in a static sense as well as a dynamic sense, since focal firms of this sort are not likely to last long unless their capabilities improve.

## REFERENCES

Abell DF. 1980. *Defining the Business: Starting Point of Strategic Planning.* Englewood Cliffs, NJ: Prentice-Hall.

Allison GT. 1971. *Essence of Decision: Explaining the Cuban Missile Crisis.* Boston: Little, Brown.

Amit R, Schoemaker PJ. 1993. Strategic assets and organizational rent. *Strategic Management Journal* 14: 33–46.

Auty S, Easton G. 1990. Patterns of competition: a study of local restaurants. *Marketing Intelligence & Planning* 8: 27–34.

Barney JB. 1991: Firm resources and sustained competitive advantage. *Journal of Management* 17: 99–120.

Baum JA, Korn HJ. 1996. Competitive dynamics of interfirm rivalry. *Academy of Management Journal* 39: 255–291.

Baum JA, Korn HJ. 1999. Dynamics of dyadic competitive interaction. *Strategic Management Journal* 20: 251–278.

Baum JA, Singh JV. 1994. Organizational niche overlap and the dynamics of organizational founding. *Organization Science* 5: 483–501.

Besanko D, Dranove D, Shanley M. 1996. *The Economics of Strategy.* New York: Wiley.

Brandenburger AM, Nalebuff B.J. 1996. *Co-opetition.* New York, NY: Doubleday.

Brandenburger AM, Stuart HW. 1996. Value-Based Business Strategy. *Journal of Economics and Business Strategy* 5: 5–24.

Chen M.-J. 1996. Competitor analysis and interfirm rivalry: toward a theoretical integration. *Academy of Management Review* 21: 100–134.

Chen M.-J, Hambrick DC. 1995. Speed, stealth, and selective attack: how small firms differ from large firms in competitive behavior. *Academy of Management Journal* 38: 453–482.

Chen M.-J, MacMillan IC. 1992. Nonresponse and delayed response to competitive moves: The roles of competitor dependence and action irreversibility. *Academy of Management Journal* 35: 539–570.

Chen M.-J, Smith KG, Grimm CM. 1992. Action characteristics as predictors of competitive responses. *Management Science* 38: 439–455.

Clark BH, Montgomery DB. 1999. *Managerial Identification of Competitors.* Working Paper No. 98–127, Marketing Science Institute, Cambridge, MA.

Cooper LG, Inoue A. 1996. Building market structures from consumer preferences. *Journal of Marketing Research* 33: 293–306.

Curran JG, Goodfellow JH. 1990. Theoretical and practical issues in the determination of market boundaries. *European Journal of Marketing* 24: 16–29.

D'Aveni R. 1994. *Hypercompetition.* New York: Free Press.

Day GS. 1981. Strategic market analysis and definition: an integrated approach. *Strategic Management Journal* 2: 281–299.

Dierickx I, Cool K. 1989. Asset stock accumulation and sustainability of competitive advantage. *Management Science* 35: 1504–1511.

Dutton JE, Jackson SB. 1987. Categorizing strategic issues: links to organizational action. *Academy of Management Review* 12: 76–90.

Eisenhardt K, Bourgeois J. 1989. Politics of strategic decision making in high-velocity environments: Toward a midrange theory. *Academy of Management Journal* 31: 737–770.

Elzinga K, Hogarty T. 1978. The problem of geographic market definition revisited: the case of coal. *Antitrust Bulletin* 23: 1–18.

Ferrier WJ, Smith KG, Grimm CM. 1999. The role of competitive action in market share erosion and industry dethronement: a study of industry leaders and challengers. *Academy of Management Journal* 42: 372–389.

Friedman TL. 1999. *The Lexus and the Olive Tree.* New York: Farrar, Straus & Giroux.

Gelman J, Salop S. 1983. Judo Economics: capacity limitation and coupon competition. *Rand Journal of Economics* (**Autumn**): 315–325.

Gimeno J, Woo CY. 1996. Hypercompetition in a multimarket environment. The role of strategic similarity and multimarket contact on competitive de-escalation. *Organization Science* 7: 322–341.

Gimeno J, Woo CY. 1999. Multimarket contact, economies of scope, and firm performance. *Academy of Management Journal* 42: 239–259.

Copyright © 2002 John Wiley & Sons, Ltd.

Grimm CM, Smith KG. 1997. *Strategy as Action: Industry Rivalry and Coordination.* Cincinnati: South-Western College Publishing.

Hruska AC. 1992. A broad market approach to antitrust product market definition in innovative industries. *The Yale Law Journal* **102**: 305–342.

Kiesler S, Sproull L. 1982. Managerial response to changing environments: perspectives on problem sensing from social cognition. *Administrative Science Quarterly* **27**: 548–570.

Lant TK, Baum JA. 1995. Cognitive sources of socially constructed competitive groups: examples from the Manhattan hotel industry. In *The Institutional Construction of Organizations*, Scott WR, Christensen S. (eds). Thousand Oaks, CA: Sage.

Lant TK, Millikin FJ, Batra B. 1992. The role of managerial learning and interpretation in strategic persistence and reorientation. *Strategic Management Journal* **13**: 585–608.

Levitt T. 1960. Marketing myopia. *Harvard Business Review* **38**: 45–56.

McGrath RG, Chen M.-J, MacMillan IC. 1998. Multimarket maneuvering in uncertain spheres of influence: Resource diversion strategies. *Academy of Management Review* **23**: 724–740.

McPherson JM. 1983. An ecology of affiliation. *American Sociological Review* **48**: 519–532.

Miller D, Chen M.-J. 1994. Sources and consequences of competitive inertia: a study of the US airline industry. *Administrative Science Quarterly* **39**: 1–23.

Mowen JC, Minor M. 1995. *Consumer Behavior*, New Jersey: Prentice-Hall.

Nedungadi P. (1990). 'Recall and consumer consideration sets: influencing choice without altering brand evaluations.' *Journal of Consumer Research* **17**(**3**): 263–276.

Nelson R, Winter S. 1982. *An Evolutionary Theory of Economic Change.* Cambridge, MA: Belknap Press.

Peter JP, Olson JC. (1993). *Consumer Behavior and Marketing Strategy.* Boston: Irwin.

Peteraf MA. 1993. The cornerstones of competitive advantage: a resource-based view. *Strategic Management Journal* **14**: 179–191.

Peteraf MA, Bergen M. 2001. *Scanning Dynamic Competitive Landscapes: A customer and resource based framework.* Working paper, Carlson School of Management, University of Minnesota.

Porac JF, Baden-Fuller C. 1989. Competitive groups as cognitive communities: the case of Scottish knitwear manufacturers. *Journal of Management Studies* **26**: 397–416.

Porac JF, Thomas H. 1990. Taxonomic mental models in competitor definition. *Academy of Management Review* **15**: 224–240.

Porac JF, Thomas H, Wilson F, Paton D, Kanfer A. 1995. Rivalry and the industry model of Scottish knitwear producers. *Administrative Science Quarterly* **40**: 203–228.

Porter ME. 1980. Competitive Strategy: Techniques for Analyzing Industries and Competitors. New York: Free Press.

Porter ME. 1983. *Cases in Competitive Strategy.* New York: Free Press.

Reger RK, Huff AS. 1993. Strategic groups: a cognitive perspective. *Strategic Management Journal* **7**: 485–501.

Rosch E. 1978. Principles of categorization. In *Cognition and Categorization.* Rosch E, Lloyd B. (eds). Hillsdale, NJ: Erlbaum.

Scheffman DT, Spiller PT. 1987. Geographic market definition under the US Department of Justice merger guidelines. *Journal of Law and Economics* **30**: 123–148.

Schelling TC. 1960. *The Strategy of Conflict.* Cambridge, MA: Harvard University Press.

Scherer FM, Ross D. 1990. *Industrial Market Structure and Economic Performance.* Boston: Houghton Mifflin.

Smith KG, Grimm CM, Gannon MJ. 1992. *Dynamics of Competitive Strategy.* Newbury Park, CA: Sage.

Stigler G, Sherwin R. 1985. The extent of the market. *Journal of Law and Economics* **28**: 555–585.

Yoffee D, Cusumano M. 1999. Judo strategy: The competitive dynamics of Internet time. *Harvard Business Review* **January–February**: 70–81.

Zajac EJ, Bazerman MH. 1991. Blind spots in industry and competitor analysis: implications of interfirm (mis)perception to strategic decisions. *Academy of Management Review* **16**: 37–46.

Copyright © 2002 John Wiley & Sons, Ltd.

# EXHIBIT G

# PUBLIC AFFAIRS

## PREVAILING IN COURT IS ONLY HALF THE BATTLE

Unique among major law firms, Brewer employs an in-house Public Affairs Group with deep expertise in issues and crisis management. (http://brewerdallasny.staging.wpengine.com/issues-crisis-management/) Our exceptional communications and public relations professionals assist clients in navigating the toughest internal and external communications challenges. As such, the firm helps clients manage their most public crises and capitalize on image-building media opportunities.

We also offer assistance in directing the management and coordination of activities taking place in the legislative and regulatory arena. Our clients are often judged in the court of public opinion. As such, even in formal litigation, winning in the courtroom may not be nearly enough in today's challenging media, business, and regulatory environment.

**GET IN TOUCH TODAY (/CONTACT)**

# EXHIBIT H

# EXHIBIT 46

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § |
|     **Plaintiff and Counter-Defendant** | § § |
| **and** | § § |
| WAYNE LAPIERRE, | § § § |
|     **Third-Party Defendant,** | § § |
| v. | §    **Civil Action No. 3:19-cv-02074-G** |
| ACKERMAN MCQUEEN, INC., | § § § |
|     **Defendant and Counter-Plaintiff,** | § § |
| **and** | § § |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § |
|     **Defendants.** | § § |

**DECLARATION OF ANDREW ARULANANDAM**

1.      My name is Andrew Arulanandam, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct.

2.       I am over twenty-one years old and am fully competent to make this declaration.  Unless otherwise noted, I have personal knowledge of all matters stated herein. I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer Attorneys & Counselors ("BAC").

1

3.      I serve as the Managing Director of Public Affairs of the National Rifle Association (the "NRA"). I have worked for the NRA for more than 19 years. As part of my job responsibilities, I interface with in-house communications professionals; outside advertising and public relations firms, such as Ackerman McQueen (AMc); and law firms, such as Brewer, Attorneys & Counselors ("BAC").

4.      I understand that AMc claims BAC is a "competitor" of the agency based on the communications services provided by BAC and its Public Affairs Group to the NRA. I am familiar with the communications services provided by BAC to our organization, and I am also familiar with the suite of communications, political consultation, web creation and advertising services previously provided by AMc to the NRA.

5.      I have worked closely with BAC Managing Director of Public Affairs Travis J. Carter and his small team of communications professionals. They have primarily assisted with communications relating to legal and regulatory matters being handled by BAC. In that regard, they have assisted in formulating media advisories, drafting public statements, and coordinating media relations activities. Given the size and strategic focus of the BAC Public Affairs Department (a total of less than five people, to my knowledge), its work for the NRA has been specialized.

6.      By comparison, and as is reflected in the Services Agreement, dated April 30, 2017, (amended May 6, 2018), which existed between the NRA and AMc, AMc was to provide the NRA a broad range of communications, branding, digital, print media and video production services. Those included, but were not limited to, generating earned media at NRA events; coordinating and scheduling appearances for NRA officials and celebrities; overseeing brand management; directing media planning and placement services; managing advertising and photography;

2

directing audio/visual and event management; providing videotaping, editing and production services; directing music composition and arrangement; directing infomercials; managing full-time webcasting; providing support services for "live" website offerings; creating graphic and flash animation; providing ongoing technical support for NRA headquarters; overseeing search engine placement; and assisting in the production and coordination of an NRA Radio Show. AMc also directed, produced, facilitated, and managed professional talent relating to the broadcasting of NRATV – an online "TV" experience managed exclusively by AMc. None of these services are provided by BAC.

7.    So expansive were the communications and advertising functions provided by AMc, the agency represented that it had, over the years, more than 100 staff members servicing the NRA account.

8.    As I stated in my declaration, dated April 14, 2020, "…the NRA has never viewed the two entities [BAC and AMc] as competitors for the expansive suite of services provided by AMc."[1]

9.    In fact, there has been no effort on behalf of the NRA to "replace" AMc with BAC – even as the NRA ended its affiliation with the agency. The bulk of the services once provided by AMc to the NRA are now being performed in-house by our organization. These functions include, but are not limited to, preparing for media appearances, drafting key messaging, directing social media campaigns, event management, maintaining our digital assets and publishing certain magazines and other NRA publications.

---

[1] See declaration from A. Arulanandam, dated April 14, 2020.

3

10.	To fill the remaining void left by the departure of AMc, the NRA has worked on a case-by-case basis with some outside PR and advertising firms, and video production companies – all of which have no affiliation with BAC.

11.	I do not believe BAC has the expertise or staffing to position itself as a "competitor" to AMc, and it seems disingenuous AMc would promote such a narrative.

12.	I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of May 2020.

_____
Andrew Arulanandam

4810-5328-4283.1
2277-08

4

# EXHIBIT 52

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** | § <br> § <br> § |
| **Plaintiff and Counter-Defendant,** | § <br> § |
| **and** | § <br> § |
| **WAYNE LAPIERRE,** | § <br> § |
| **Third-Party Defendant,** | § <br> § |
| **v.** | § **Civil Action No. 3:19-cv-02074-G** <br> § |
| **ACKERMAN MCQUEEN, INC.,** | § <br> § |
| **Defendant and Counter-Plaintiff,** | § <br> § |
| **and** | § <br> § |
| **MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG,** | § <br> § <br> § <br> § <br> § |
| **Defendants.** | § |

## DECLARATION OF CRAIG SPRAY

My name is Craig Spray, and I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following statements are true and correct.

1.      I am over twenty-one years old and am fully competent to make this declaration. Unless otherwise noted, I have personal knowledge of all matters stated herein. I submit this declaration in support of the NRA's Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (William A. Brewer III ("Brewer") and Brewer, Attorneys & Counselors ("BAC")).

1

2.      I am the Treasurer and Chief Financial Officer of the National Rifle Association of America ("NRA").  I joined the NRA on March 15, 2018 as Chief Financial Officer, and on September 13, 2018, was also elected Treasurer.  Thus, during all times relevant to the issues herein, I was employed by the NRA as the Chief Financial Officer.

3.      Prior to working at the NRA, I served as Senior Vice President and Chief Financial Officer of Knoll Inc., a publicly traded home and office products company with more than $1 billion in annual sales.

4.      As Treasurer and Chief Financial Officer, I oversee all financial actions of the NRA and am responsible for managing the finance and accounting departments.  In this capacity, I ensure that the company's financial reports are accurate, measured against budgets for the year and completed in a timely manner.

5.      Before spending any time with Bill Brewer, I personally knew that executives, accounting personnel and Board members expressed serious concerns about Ackerman McQueen ("AMc") during 2018.  Among those concerns were the integrity of its billing practices, the utility of many of its services and the direction of its messaging for the NRA. With that background and given the sheer size of its billing – approximately $40 million that year – I was anxious to meet the leaders at AMc.  My first in-person meeting with AMc occurred in June 2018 in Dallas, Texas at AMC's offices.  The purpose of the meeting was general relationship building, and I wanted to understand what AMc did for the NRA, as AMc was the largest vendor for the NRA at the time. Unfortunately, when I attempted to learn more about plans for the 24-hour digital platform run by AMc, NRATV, I apparently touched a raw nerve in Revan McQueen.  Specifically, when I asked how many unique visitors were measured on various live programs on NRATV, Revan became extremely agitated, told me I did not know what I was talking about, said that questions about

2

"unique visitors" are a "false narrative", and summarily walked out of the meeting for a period of time. For the balance of the day, I completed interviews with other executives of AMc.

6.      When I flew back to the Northeast the next day and exited the aircraft, I was alarmed by several voicemails on my phone stating that Ackerman was demanding I be fired because I wasn't the "right guy for the job". Later, I came to understand that the NRA was attempting to ascertain and monetize the NRATV platform and among its concerns was the significant expense invoiced to the NRA and the NRA's inability to receive clarity on the platform's unique viewership.

7.      A few months later on October 11, 2018, Wayne LaPierre and I visited AMc at its offices in Dallas, TX to identify ways to reduce costs in the fourth quarter of 2018 and understand how those savings might be applied to the 2019 budget.

8.      I have read Revan McQueen's declaration filed in support of AMc's Motion to Disqualify NRA's Counsel. His version of the events that took place at this meeting on October 11, 2018, are grossly inaccurate.

9.      What occurred on October 11, 2018 was one of the least professional meetings of my career. Wayne and I had travelled to AMc's office to understand what services were being provided, what services we required, and what the services would cost. What ensued was an epithet-filled tirade by Revan and Angus McQueen and other members of the AMc team. AMc repeatedly acted as if they were enraged by our desire to cut their approximately $40 million a year budget. AMc's short-sighted and entitled position that the NRA's need to make budget cuts was tantamount to "taking" money from them rang hollow in my ears. I remember trying to explain to them that other vendors provide support for membership, marketing and legal advice – it was only in this regard that questions about what the NRA was spending on legal fees arose.

3

10.     Contrary to Revan's testimony, BAC legal fees and representation of the NRA were not the focus of the meeting; the focus. As mentioned earlier was on AMc-related services and costs. AMc seemed to believe that any fees paid to other vendors were an unwise expenditure if AMc received less than $40 million per year. At one point, I remember trying to explain that BAC's services were in no way at odds with AMc's services. This wasn't a competition. Our efforts to meet with Revan and Angus were to discuss a prudent budget for the NRA, and I recall telling them that "if you want to provide other services, we have no objections to your doing so; we simply need to discuss it as part of our larger 2019 budget planning for the entire business." At the end, Angus and Revan oddly demanded that Wayne and I return all paper copies (as well as all of my notes taken during the meeting) of the reduced services we discussed during the meeting.

11.     Never in my entire career as a finance executive have I dealt with business partners that acted in such an unprofessional manner. Finally, Revan falsely states that Wayne and I agreed with him and Angus that Brewer's conduct towards AMc was "inappropriate and aggressive". Wayne and I made no such statements.

12.     I declare under penalty of perjury that the foregoing is true and correct.

Executed this _4th_ day of April 2020.
(eas) May

_____
Craig Spray

4

# EXHIBIT I

# EXHIBIT 49

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § | |
| Third-Party Defendant, | § § | |
| v. | § § | Civil Action No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § § | |
| Defendant and Counter-Plaintiff, | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, and JESSE GREENBERG, | § § § § § | |
| Defendants. | § § | |

## DECLARATION OF TRAVIS J. CARTER

1.      My name is TRAVIS J. CARTER. I am over the age of twenty-one years and am

fully competent and able to testify herein and to state that all of the facts and statements herein

contained are true and correct and that, except as expressly noted otherwise, I have personal

knowledge of the same.

2.      I am the Managing Director of Public Affairs at Brewer, Attorneys & Counselors

("BAC" or "the Brewer firm"), outside counsel for the National Rifle Association of America

("NRA" or "the Association").

1

3.      I have more than 25 years of experience in news reporting, media and public

relations, strategic communications, and issues & crisis management. My experience includes

working in the print news media, and working in communications for the Federal Reserve Bank

of Dallas, Allstate Insurance Company, BAC (formerly Bickel & Brewer), and my own public

relations agency, Carter PR. I have a bachelor's degree in Journalism & Mass Communications

from The University of Oklahoma and hold an MBA from The University of Dallas.

**A Working Relationship with AMc**

4.      Since I first became employed with BAC in 2001, I have worked closely with

various representatives of Ackerman McQueen ("AMc"). BAC relied upon AMc to provide

many professional services for the firm, including, but not limited to, design and management of

multiple websites, creative development for advertisements, video production, brand and

logo development, and design and implementation of marketing materials.[1]

5.      With my input and direction, these services were utilized by BAC, as well as the

firm's charitable foundation and a suite of educational programs it offers to the community. For

example, AMc directed logo development, branding campaigns, and some video services for the

Brewer Foundation / NYU International Public Policy Forum ("IPPF"), a high school debate

contest that serves students around the globe. AMc also assisted with logo development and

branding for the Brewer Foundation Future Leaders Program ("FLP"), an academic and

leadership development program that serves disadvantaged students from urban communities in

Dallas, Texas.

---

[1] *See* Declaration of Travis Carter at ¶ 5, dated March 4, 2020, attached as Ex. 36 to the Declaration of Michael Collins ("Collins Decl.).

6.     When it was suggested that the Brewer Foundation "live stream" high school student debates promoted and sponsored by the IPPF and BAC, I enthusiastically supported the idea, directing the hiring of AMc, arranging payment of the agency's travel costs, and working with AMc principals on this project.

7.     BAC staff members actually collaborated with a team of AMc professionals in New York City for many years to conduct the IPPF live video proceedings from the Harold Pratt House – home of the Council on Foreign Relations. In addition, AMc professionals helped direct a social media campaign to drive awareness of the IPPF and its unique global platform.

8.     In sum, Bill Brewer, BAC, and I engaged AMc for an assortment of important projects for almost *20 years* – until December 2019. I understand that, during this time, the Brewer firm paid AMc more than $1 million. Further, I have been personally involved in recommending the professional services of AMc to other clients of the Brewer firm. On one occasion, this resulted in the agency submitting a proposal for a lucrative website project for a Fortune 500 company.

**BAC and AMc Not Competitors**

9.     Given the nature of the professional relationship between BAC and AMc, I am surprised to learn that AMc alleges BAC is a competitor to the agency.  BAC is not a competitor to the agency. It has never viewed itself as such.[2] There is no legitimate basis upon which AMc claims that the Brewer firm seeks to "compete" with AMc or replace it as the advertising or communications firm of record for the NRA.

10.     BAC employs a small number of professionals in its Dallas office who primarily work in the field of legal communications and issues & crisis management – the Public Affairs

---

[2] *Id.* at ¶ 12.

3

Group.[3] This group primarily works on communications strategy in helping clients navigate media issues, regulatory challenges, and reputational exposure associated with legal matters being handled by the firm.

11.    The group is comprised of professionals with backgrounds in news reporting, media relations, and corporate communications. None of the communications professionals employed by BAC specialize in advertising, website development, or marketing.

12.    Over the years, BAC's team of communications professionals has worked cooperatively with a wide range of clients, ranging from 3M Company to New York University, and the *outside* public relations agencies those clients employ in connection with legal services provided by the firm. This work has been viewed positively by BAC clients, their in-house communications professionals, and outside PR and communications firms enlisted as part of a "multi-pronged strategy" to manage legal communications and confront reputational challenges.

**Many Law Firms Offer Strategic Communications Services**

13.    I understand that AMc claims that the Brewer firm is unique in its efforts to promote its ability to offer crisis management and PR services to clients.[4] That claim is false.

14.    Many senior lawyers and the firms they lead (of all shapes and sizes) routinely offer crisis management and communications services to their clients. Many law firms in BAC's competitive set – and firms it opposes – employ practice groups that engage in legal

---

[3] *See* Brewer, Attorneys & Counselors Public Affairs Group electronic biographies: Travis Carter, Andrea Sadberry, and Katherine Leal Unmuth, available at: https://www.brewerattorneys.com/team-1, attached as Ex. 54 to the Collins Decl.

[4] *See* ECF 105, Brief in Support of AMc's Motion to Disqualify Plaintiff's Counsel.

4

communications and PR. These practice groups are often touted as being more efficient and cost-effective than PR firms in the arena of legal communications.[5]

15.     It has been widely reported in legal trade publications that this is especially true for firms like BAC that specialize in high-stakes advocacy that generates public attention.[6] In fact, it was national reporting on this subject that spawned a Texas practice commentary from Bill Brewer about the benefits derived from having lawyers involved in legal communications and PR.[7]

16.     At the request of the NRA, BAC has assigned professionals to provide media relations and public relations services to the Association in connection with the legal and regulatory matters being handled by the firm. However, the work performed by the firm's communications professionals is fairly specialized. As evidence of how limited these services are in aggregate, <u>none</u> of these individuals work solely for the NRA.[8]

**AMc:  A Suite of Services**

17.     By comparison, I understand that AMc provided a *broad range* of communications and upscale video production services for the NRA. The relationship between the advertising agency and the NRA, which spanned several decades, had culminated in billings for AMc that exceeded tens of millions of dollars annually – apparently involving AMc

---

[5] *See* promotional materials from Quinn Emanuel, attached as Ex. 55 to the Collins Decl.; *see also* promotional materials from Akin Gump, attached as Ex. 56 to the Collins Decl.

[6] *See* American Lawyer article, "Meet the Lawyers Who Clean Up Clients' Worst Messes," dated March 28, 2019, attached as Ex. 11 to the Collins Decl.

[7] *See* Texas Lawyer commentary, "Advocacy as Art:  Lawyers Must Engage in Issues and Crisis Management," dated May 6, 2019, attached as Ex. 15 to the Collins Decl.

[8] *See* Ex. 36 at ¶ 9.

5

employees spread across four offices in Oklahoma City, Oklahoma; Dallas, Texas; Colorado Springs, Colorado; and Alexandria, Virginia.

18.      AMc reported that many of these employees were <u>exclusively</u> dedicated to serving the NRA. That said, I understand that at least one other AMc client believes the agency assigned professionals to its account who were supposed to be dedicated full-time to the NRA.[9]

19.      Unlike any services offered by BAC, I understand that a flagship deliverable for AMc was a multimedia platform that featured daily "live television" – complete with news anchors, writers, producers, and production assistants. The agency utilized a dedicated production studio in the office of its Alexandria, Virginia-based subsidiary, Mercury Group, and often deployed video crews, TV hosts, and technicians to locations around the United States and world in connection with its services.

20.      As part of its self-described "brand influence strategy," AMc reportedly specializes in the building, management and leveraging of "media properties" for clients. Indeed, the biography of AMc CEO Revan McQueen says that the agency leads communications efforts to "support the successful scaling of premium video products." Under the direction of Mr. McQueen, Ackerman [AMc] is proudly transitioning the advertising agency "to become a media company in and of itself."[10]

21.      For all these reasons, it strains credibility for AMc to argue that the small public affairs team of BAC <u>ever</u> sought to replace the core services provided by the agency to the NRA.

---

[9] *See* email communication from Dan Boren, dated May 30, 2019, attached as Ex. 18 to the Collins Decl.

[10] *See* electronic biography of AMc CEO, Revan McQueen, attached as Ex. 16 to the Collins Decl.

Indeed, the firm "does not have the professional resources, expertise, or inclination" to occupy such space for the NRA or any other clients.[11]

22.     Further, the NRA's own managing director of Public Affairs finds the claim that BAC sought to replace AMc "disingenuous and without factual basis" and notes that the "NRA has never viewed the two entities as competitors for the expansive suite of services provided by AMc."[12]

**Upon Closer Review:  BAC's Role for the NRA**

23.     Purportedly to illustrate that AMc was being "replaced" by BAC, the agency cites work in which I was involved. This includes the drafting of certain press releases soon after BAC was retained in March 2018.

24.     Any press releases drafted by BAC related to legal and regulatory issues being handled by lawyers with BAC. As an example, the firm drafted a press release relating to the NRA's lawsuit against New York Governor Andrew Cuomo and the New York State Department of Financial Services, dated May 11, 2018.[13]

25.     This was a communications tool that relates specifically to legal services being provided by BAC. It was clearly more practical for BAC, versus AMc, to draft such public-facing communications that summarized the legal and regulatory positions being advanced by the NRA.

---

[11] *See* Ex. 36 at ¶ 13.

[12] *See* Declaration of Andrew Arulanandam, dated April 14, 2020, attached as Ex. 38 to the Collins Decl.

[13] *See* press release, "The NRA Sues New York Governor Andrew Cuomo, New York State Department of Financial Services Over Alleged Attack on First Amendment Rights," dated May 11, 2018, attached as Ex. 4 to the Collins Decl.

APPENDIX_92 of 98

26.     On April 5, 2018, BAC drafted media statements responding to anticipated legal and PR-related issues arising from the actions of Citigroup to restrict its retail clients' access to firearms sales. The firm *copied* AMc senior directors on proposed communications – working in collaboration to confront a potentially negative situation for the NRA.[14]

27.     Shortly thereafter, on April 13, 2018, BAC drafted communications for board members, NRA members, and the news media in connection with another *legal concern*:  the cancellation of insurance policies affiliated with Lockton Affinity, LLC ("Lockton") maintained by NRA members and gun owners in New York. The AMc Motion to Disqualify argues this was done to "supplant" AMc. In fact, these communications were sent *to* Angus McQueen – again in cooperation to support the defense of the NRA and the members it serves.[15]

28.     Many NRA principals, including Secretary and General Counsel John Frazer and former outside counsel J. Steven Hart, were copied on these communications.

29.     I am unaware of <u>any</u> press releases drafted or disseminated by AMc on the topics in question during this time period – even though I understand the agency had a retainer for which it was paid significant sums of money to render such services and professional advice.

30.     AMc also argues that BAC, in an effort to take over its function, directed speechwriting services once performed solely by the agency, including a March 2019 speech for Wayne LaPierre in connection with the Conservative Political Action Conference ("CPAC"). The CPAC speech in question is focused, in significant measure, on the NRA's First Amendment

---

[14] *See* ECF 80, Ex. A-8.

[15] *See* ECF 80, Ex. A-9

8

(free speech) lawsuit against New York Governor Andrew Cuomo and promised investigatory proceedings by the New York Attorney General.[16]

31.     The remarks bore the working title, "This is Our Moment of Truth:  Wayne LaPierre Calls for Protection of **Free Speech** in Debate Over Second Amendment." They were drafted for Mr. LaPierre at his specific direction.

32.     AMc has made repeated reference to a presentation from me as evidence that BAC provides counsel on matters involving "the court of public opinion." I did present to the NRA Public Affairs Committee a presentation, dated January 4, 2019, at the request of the NRA.[17] AMc officials (as representatives of the NRA's agency of record) were present during the meeting.

33.     The presentation primarily related to reputational concerns stemming from legal and regulatory issues – media pursuits relating to board contracts, governance issues, and the like. There was discussion of the "court of public opinion" and how it intersects with "The Courtroom" and "The Regulatory Arena." Specifically, this briefing "covered public-facing communications efforts concerning legal and regulatory matters" being handled by BAC.[18]

34.     This was not a presentation about how to advance generalized PR or advertising services. Indeed, the reference to the "Court of Public Opinion" is a point that follows mention of Lockton (a legal matter) and Gov. Andrew Cuomo (a legal and regulatory concern, and defendant).

---

[16] *See* W. LaPierre CPAC speech, dated March 2, 2019, attached as Ex. 8 to the Collins Decl.

[17] *See* ECF 81-2 [APP001130-APP001162].

[18] *See* declaration from Andrew Arulanandam, dated April 14, 2020, attached as Ex. 38 to the Collins Decl.

9

35.     I was told that AMc never presented to the Public Affairs Committee in connection with these types of issues.

**False Allegations of "Leaking" Information**

36.     I understand that AMc accuses BAC of "leaking" documents and lawsuits to inflict reputational damage on the agency. As an example, AMc implies the Brewer firm may have "leaked" to the news media a communication to the NRA Board of Directors, dated April 25, 2019, from NRA CEO & EVP Wayne LaPierre. AMc says the "leaked" document was cited by *The Wall Street Journal* ("*WSJ*"). I am not aware who provided this document to the *WSJ*.

37.     I am the person who most often directly interacts with the news media on behalf of BAC. I did not provide the April 25, 2019, communication to the media before reports emerged about it. Rather, I was confronted with questions from several reporters, including those from the *WSJ*, about the contents of the communication. On the afternoon of April 25, 2019, the communication had become "public" due to its dissemination to an estimated 76 NRA board members and employees of the Association.

38.     I also did not "leak" copies of legal filings against AMc. There have been several *publicly filed* legal actions between the parties. During the course of the disputes between AMc and the NRA, I have not distributed draft copies of any legal filings (*i.e.,* "leaked") to members of the news media.

39.     There has been public interest in these legal proceedings, likely due to the parties involved and the unraveling of long-term partnerships. Accordingly, BAC, on occasion, has publicly commented on behalf of its client about these legal proceedings and confronted false claims and allegations made by AMc and its principals.

**The PR Tactics of AMc**

10

40.     After April 24, 2019, AMc, as reportedly promised, has been involved in an

aggressive campaign to disparage the NRA and distort the public record. For example, on July 3,

2019, AMc made public accusations that the NRA was threatening AMc employees "with the

loss of their unemployment and benefits" and accused the NRA of embarking upon a

"destructive plan" to "hurt as many people as they can."[19]

41.     I became aware of these claims (and an AMc-sponsored media advisory to give

them maximum effect) based on phone calls I received from news reporters while I was with my

family in Colorado.

42.     The media advisory was sprung just hours before the Fourth of July. It generated

multiple media inquiries to which the NRA had to hurriedly respond – in an attempt to correct

the record and confront unfounded allegations. Predictably, AMc's premeditated attack on an

unsuspecting NRA spawned numerous negative articles full of disinformation contained in the

media advisory.[20][21]

43.     I understand that AMc's *Brief in Support of Defendants' Motion to Disqualify*

*Plaintiff's Counsel* includes an appendix that purports to chronicle all media statements from

BAC on behalf of the NRA. However, the appendix omits the media record from July 3-4, 2019,

likely to avoid drawing attention to AMc's unprovoked reputational attacks on the NRA.

---

[19] *See* statement from AMc, dated July 3, 2019, attached as Ex. 22 to the Collins Decl.

[20] *See* Oklahoman article, "Ackerman McQueen Accuses NRA of Threatening Employees," dated July 4, 2019, attached as Ex. 24 to the Collins Decl.

[21] *See* Talking Points Memo article, "Jilted NRATV Firm Accuses Gun Group of 'Hurting as Many People as Possible," dated July 3, 2019, attached as Ex. 23 to the Collins Decl.

11

44.      AMc has widely distributed a barrage of negative media advisories, blistering quotes, and other communications meant to harm BAC and the NRA.[22] Following the filing of AMc's *Brief in Support of Defendant's Motion to Disqualify Plaintiff's Counsel*, I received a media call about information in the filing that supposedly had been redacted – but was *still viewable* and accessible to the public. This resulted in negative media reports about the "redacted" information.[23]

45.      I believe AMc's actions and inflammatory campaign messaging have contributed to the intense public scrutiny of the agency. I am aware of <u>many</u> national media reports that question the value and sensibility of AMc's public messaging strategy on behalf of the NRA and, in particular, NRATV.[24][25][26][27][28]

46.      For example, the *New York Times* ("*NYT*") article, "Incendiary N.R.A. Videos Find New Critics:  N.R.A. Leaders," dated March 11, 2019, was spawned by controversial and

---

[22] *See* public statement by AMc, dated April 15, 2019, attached as Ex. 12 to the Collins Decl.; public statement from AMc contained in Bloomberg article, "Ad Firm Cuts Ties With NRA, Says 'Chaos Led Us To Lose Faith' After 38 Years," dated May 29, 2019, attached as Ex. 17 to the Collins Decl.; public statement by AMc, dated June 26, attached as Ex. 20 to the Collins Decl.; public statement by AMc, dated August 30, 2019, attached as Ex. 25 to the Collins Decl.; public statement by AMc, dated September 13, 2019, attached as Ex. 26 to the Collins Decl.; Stephen Gutowski, Twitter page containing AMc statements, dated October 28, 2019, attached as Ex. 29 to the Collins Decl.; *see* Newsweek article, "NRATV Creator Threatens 'Legal Action' Against Former Host Over 'Fabrications,'" dated December 18, 2019, attached as Ex. 30 to the Collins Decl.; *see* Wall Street Journal Article, "NRA Fails to Stop Former Ad Agency From Cooperating With New York Probe," dated February 24, 2020, attached as Ex. 35 to the Collins Decl.

[23] *See* Newsweek article, "Longtime NRA Attorney Says Group's Own Lawyer Embarked on 'Highly Destructive' Path; Court Documents Show," dated April 17, 2020, attached as Ex. 39 to the Collins Decl.

[24] *See* Vanity Fair, "What the F--k is NRATV? Let John Oliver Explain," dated March 5, 2018, attached as Ex. 2 to the Collins Decl.

[25] *See* TIME, "At the NRA's TV Network, Guns Are a Weapon in the Culture Wars," dated November 16, 2017, attached as Ex. 1 to the Collins Decl.

[26] *See* CNN, "NRA TV depicts 'Thomas & Friends' characters in KKK hoods," dated September 14, 2018, attached as Ex. 7 to the Collins Decl.

[27] *See* NPR, "NRATV Strays Seemingly Far Afield From Gun Ownership," dated May 7, 2018, attached as Ex. 3 to the Collins Decl.

[28] *See* The Atlantic, "Live-Streaming the Apocalypse With NRATV," dated June 2018, attached as Ex. 5 to the Collins Decl.

hate-filled messaging that came to be associated with NRATV.[29] The Brewer firm did not cause the editorial pursuit of the subject matter.

47.     The NYT proactively contacted the NRA and its representatives to advise it was pursuing the investigative article, upon reportedly learning that certain NRA board members, like the general public, were increasingly uncomfortable with the "site's [NRATV] inflammatory rhetoric, and whether it has strayed too far from the N.R.A.'s core gun-rights mission…"

48.     In fact, AMc has admitted that it recognizes the "offensive imagery" that served as a catalyst for the *NYT's* reporting.[30]

**In Sum:  No Attempt to "Replace" AMc**

49.     I do not believe there is any legitimate argument that BAC sought to "replace" AMc as the NRA's communications or advertising agency of record. BAC, with its small team of communications professionals, lacks the resources, expertise or inclination for such an undertaking. The work performed by BAC for the NRA is not unusual in the field of high-stakes advocacy, and often offered by law firms to the clients they represent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May 2020.

Travis J. Carter

---

[29] *See* New York Times article, "Incendiary N.R.A. Videos Find New Critics:  N.R.A. Leaders," dated March 11, 2019, attached as Ex. 9 to the Collins Decl.

[30] *See* Ex. 36 at ¶ 4.

13